**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 21, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

GLENN DOUGLAS ANDERSON,

Petitioner-Appellant,

v.

No. 04-6397

MARTY SIRMONS, Warden,
Oklahoma State Penitentiary,

Respondent-Appellee.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. CV-01-177-M)**

Lisa S. McCalmont (Randy Bauman with her on the briefs), Assistant Federal
Public Defenders, Oklahoma City, Oklahoma, for Appellant.

Robert Whittaker, Assistant Attorney General (W. A. Drew Edmondson, Attorney
General of Oklahoma, with him on the brief), Oklahoma City, Oklahoma, for
Appellee.

Before **LUCERO**, **EBEL**, and **MURPHY**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I. INTRODUCTION

Following trial in Oklahoma state court, a jury convicted Glenn Douglas Anderson of, *inter alia*, three counts of first degree murder. *Anderson v. State*, 992 P.2d 409, 412-13 (Okla. Crim. App. 1999). The jury sentenced Anderson to death on each of the three murder convictions. *Id.* at 413. The Oklahoma Court of Criminal Appeals ("OCCA") affirmed on direct appeal Anderson's convictions and death sentences. *Id.* at 425. It also denied his subsequent request for post-conviction relief. *Anderson v. State*, No. PC-99-818, slip. op. at 7 (Okla. Crim. App. Jan. 26, 2000). Anderson then filed the instant 28 U.S.C. § 2254 habeas corpus petition in federal district court. In his § 2254 habeas petition, Anderson asserted ten grounds in support of his claim that both his convictions and death sentences were constitutionally infirm. The federal district court denied relief on all grounds set out in Anderson's habeas petition. On appeal, Anderson limits his challenge to the constitutional validity of his death sentences, raising six claims of constitutional error during the penalty phase of the state court proceedings.[1]

---

[1]Anderson raises on appeal the following six issues: (1) trial counsel failed to properly investigate and present a constitutionally adequate case in mitigation during the penalty phase of the trial; (2) he was denied fundamental fairness when the trail court restricted voir dire regarding a potential juror's ability to consider all three possible punishment options should the jury eventually find Anderson guilty on the murder charges; (3) his right to a fundamentally fair trial was violated because his trial was held in a courtroom where a mural over the bench depicted the biblical phrase "An eye for an eye and a tooth for a tooth"; (4) the admission of irrelevant victim impact evidence during the penalty phase of the

(continued...)

He also asserts the federal district court erred in denying his request for discovery and an evidentiary hearing on his ineffective assistance claim.

Upon review, this court concludes Anderson has demonstrated he received constitutionally ineffective assistance of counsel during the penalty phase of his trial.[2]  Having so concluded, it is unnecessary to address the other contentions raised by Anderson on appeal.  The order of the district court denying Anderson's § 2254 habeas petition is hereby **reversed** and the matter is **remanded** to the district court to grant the writ consistent with this opinion.


## II. BACKGROUND

*A. Factual Background*

The background facts leading to Anderson's arrest and prosecution, as summarized by the OCCA, are as follows:

> Between 3:00 and 4:00 a.m. on September 28, 1996, [Anderson] burst into the trailer home of Marvin Mathesen brandishing a firearm.  [Anderson] told Mathesen that they needed to talk.  Shortly thereafter, Richard Thornburg and Roger Embrey also entered the trailer.  Thornburg had been shot prior to this night and

---

[1](...continued)
trial rendered the sentencing proceeding fundamentally unfair; (5) Oklahoma's continuing threat aggravating circumstance is unconstitutionally vague and overbroad; and (6) the prosecution failed to submit sufficient evidence in support of the murder-committed-to-avoid-lawful-arrest aggravating circumstance.

[2]Because the district court granted Anderson a certificate of appealability as to each issue raised on appeal, this court has jurisdiction over this appeal pursuant to 28 U.S.C. § 2253(c).

the three wanted to question Mathesen about the shooting. All three men were armed and they told Mathesen they were going to shoot him if he lied to them. The three men also suspected Jim Poteet in the shooting. They decided to question Mathesen and Poteet together so they could figure out whether Mathesen or Poteet had shot [Thornburg].[3]

The three armed men forced Mathesen out of his trailer at gun point and drove him to Poteet's residence. Once there, Thornburg and Embrey went into the house and [Anderson] and Mathesen stayed in the car. When [Anderson] and Mathesen heard gun shots come from the house they went to see what had happened. They saw Terry Shepard sitting in a chair by the bathroom door and Poteet sitting on the bed in the back bedroom. Thornburg was holding Poteet at gun point. Poteet had been shot in the foot and was bleeding between the eyes.

[Anderson] suggested that Thornburg take Mathesen and go get any people present from Poteet's rental house which was located about seventy yards from Poteet's residence. While they were walking over to the rental house, Keith Smith walked up the driveway. Thornburg forced Smith to knock on the door of the rental house and when he did, Donnie Scott opened the door. Thornburg then forced Scott, Smith and Mathesen to walk back to Poteet's residence.

Once back at Poteet's house, Thornburg went back into the bedroom with Poteet. Soon, Embrey took Mathesen to the back bedroom. In the bedroom, Thornburg gave Mathesen a gun and told him to shoot Poteet while [Anderson], Thornburg and Embrey all pointed their guns at Mathesen. A gunshot was fired from behind Mathesen and Poteet was shot in the side. The only person standing behind Mathesen at this time was Thornburg. Thornburg, [Anderson] and Embrey then told Mathesen to shoot another person or they

_____

[3]In this sentence of its factual summary, the OCCA refers to Anderson as the person who had been shot prior to the evening of September 28, 1996. In a prior sentence in the same paragraph, however, the OCCA refers to Thornburg as the assailant who had previously been shot. *Anderson v. State*, 992 P.2d 409, 413 (Okla. Crim. App. 1999). As noted by the district court, the trial transcript makes clear that Thornburg, not Anderson, was the individual that had been shot prior to the night upon which Anderson, Thornburg, and Embrey participated in the murders leading to Anderson's prosecution.

would shoot Mathesen. Mathesen shot at Scott but the gun did not fire. Thornburg made Mathesen fire again while [Anderson] and Embrey pointed their guns at him. This time Mathesen shot Scott in the chest. Embrey took Mathesen outside to the car. While they were at the car, Mathesen heard more shots come from the house. The house was burned and [Anderson], Thornburg, Embrey and Mathesen left the area in Thornburg's car. They stopped to hide the guns and let Mathesen out of the car.

Shortly after 5:00 a.m. Loyd Keagans and his son, who were driving by, noticed the burning house. As they drove up to the house, they saw an injured man outside. This man was Donnie Scott, who had been shot in the chest. The Keagans took Scott to a convenience store and called the police. Scott survived the shooting but the bodies of Jim Poteet, Keith Smith and Terry Shepard were found in the burned house. Each of them had been shot and had either died from gunshot wounds or a combination of gunshot wounds and fire related injuries.

When Scott was able, he gave a statement to the police telling what had happened. Mathesen also told the authorities what had happened. [Anderson], Embrey and Thornburg were subsequently arrested.

*Anderson*, 992 P.2d at 413-14.

## B. Procedural Background

The procedural history of Anderson's claim of ineffective assistance of counsel is unusual. Anderson did not raise on direct appeal or in his state application for post-conviction relief a claim his counsel was constitutionally ineffective for failing to develop an adequate case in mitigation during the penalty phase of the trial. Instead, the issue was raised for the first time in Anderson's § 2254 habeas petition in federal court. Anderson argued the district court should nevertheless decide this unexhausted issue on the merits because both direct appeal counsel and state-provided post-conviction attorneys labored under an

-5-

actual conflict of interest which precluded him from receiving effective assistance of counsel. *See* 28 U.S.C. § 2254(b)(1)(B)(ii) (providing an exception to the general exhaustion requirement when "circumstances exist that render [state court remedies] ineffective to protect the rights of the applicant"). In the alternative, Anderson requested that the district court hold his § 2254 habeas petition in abeyance so he could return to state court and exhaust his state court remedies.

In a written order, the district court denied Anderson's request to decide the unexhausted ineffective assistance claim on the merits and, instead, abated Anderson's habeas petition so he could return to state court and exhaust the claim. In so doing, the district court began by noting

> Although the arguments set forth by [Anderson] in this case perhaps offer a basis for avoiding the procedural default rule, no such rule has been applied by an Oklahoma court to the claim presented in Ground One of the instant petition. [Anderson's] argument fails to establish the absence or insufficiency of any available process by which he could raise the issue at this time. Indeed, [Anderson] is not without recourse in an effort to exhaust the unexhausted portion of his ineffective assistance of counsel claim.

*Anderson v. Mullin*, No. CIV-01-177-M, slip op. at 3 (W.D. Okla. June 11, 2003).

The district court then went on to conclude there was a real possibility Anderson's claim would be addressed on the merits in state court and that Rule 9.7(G) of the Rules of the Oklahoma Court of Criminal Appeals[4] provided a

---

[4]Rule 9.7(G) provides that a second or successive application for post-conviction relief can be considered by the OCCA to the extent such petition raises
(continued...)

procedural mechanism for Anderson to raise his ineffective assistance claim in state court in a subsequent state application for post-conviction relief. Because of what the district court perceived as a potential for availability of state process, and because it was less than clear Anderson's claim was procedurally barred, the district court abated the case pending further proceedings in Oklahoma state court.

After the district court abated Anderson's federal habeas petition, Anderson's federal counsel made a special appearance in Oklahoma state court to request the appointment of conflict-free counsel to represent Anderson in a second application for post-conviction relief. Federal habeas counsel noted that he was prohibited from providing substantive representation to Anderson in state court because the scope of his representation was limited to the federal habeas proceedings. He further indicated, however, that his special appearance was the only feasible means to adequately call this matter to the state court's attention. In response to the motion, the Oklahoma District Court of Grady County entered an order appointing the Oklahoma Indigent Defense System ("OIDS") to represent

---

[4](...continued)
claims in which the factual or legal basis was unavailable at the time of the filing of the original application for post-conviction relief. Rules of the Oklahoma Court of Criminal Appeals, Okla. Stat. Ann., tit. 22, ch. 18, app. Subsection 9.7(G)(3) further provides, however, that such a claim shall not be considered unless the successive application for post-conviction relief is filed within sixty days "from the date the previously unavailable legal or factual basis serving as a basis for the new issue is announced or discovered." *Id.*

Anderson in pursuing a second application for post-conviction relief in the OCCA. The order further provided that if the OIDS did not hire conflict-free counsel to represent Anderson, the matter would be set for further hearing. The OIDS then hired Andrea Miller to represent Anderson in pursuing a second state application for post-conviction relief.

Miller thereafter filed an Entry of Appearance and Notice to Court in the OCCA (the "Notice").[5] The Notice was filed in the OCCA on July 15, 2003, approximately twenty months after Anderson filed his federal habeas petition and approximately forty-three months after the OCCA denied Anderson's initial request for post-conviction relief. The Notice set out the procedural history relating to Miller's appointment, the underlying basis for Anderson's claim of ineffective assistance of counsel during the penalty phase of the trial, and the facts indicating the OIDS may have been operating under a conflict of interest when it represented Anderson on direct appeal and on his first application for post-conviction relief. Based on the recency of her appointment, the voluminous record, and the exceedingly complex nature of the issues involved, Miller asked the OCCA to grant her additional time within which to review, investigate, and prepare a successor petition for post conviction relief. The OCCA denied the

---

[5]*See* Okla. Stat. Ann. tit. 22, § 1089 (providing that application for post-conviction relief where applicant is under penalty of death shall be filed directly with OCCA).

request for additional time to prepare a second petition for post-conviction relief, simply noting that any successor petition would be untimely under Rule 9.7(G)(3) of the Rules of the Oklahoma Court of Criminal Appeals. In light of the order of the OCCA denying the extension on the basis of Rule 9.7(G)(3), both OIDS and Miller concluded it would be futile to proceed further with Miller's representation of Anderson in state court proceedings.

Anderson then filed a Motion to Restore Case to Active Status and Proceed to Merits Adjudication (the "Motion to Restore") in federal district court. In the Motion to Restore, Anderson argued he had exhausted his claim and that the procedural bar applied by the OCCA, Rule 9.7(G)(3), was not sufficient to bar the claim on federal habeas review because it was not regularly and consistently applied. As to the matter of exhaustion, Anderson noted the order of the OCCA denying Miller additional time to prepare a successor state application for post-conviction relief made clear that no such application would be accepted because it would be untimely under Rule 9.7(G)(3). The preemptive application of a procedural bar rendered the actual filing of a second application for post-conviction relief futile and fully exhausted available state court remedies. With regard to the procedural bar, Anderson cited numerous instances in which the OCCA had declined to apply the procedural bar set out in Rule 9.7(G)(3) in situations similar to his. Because the OCCA had not applied the procedural bar regularly and consistently in the vast majority of cases, Anderson argued Rule

9.7(G)(3) was not adequate to bar federal review of his claim of ineffective assistance during the penalty phase of his state court trial. *See Ford v. Georgia*, 498 U.S. 411, 424 (1991); *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988).

In its response to the Motion to Restore, Oklahoma simply averred that Anderson had not properly exhausted his ineffective assistance claim as to the penalty phase of the trial because he had not filed a second application for post-conviction relief with the OCCA. Oklahoma supported this assertion with an unusual argument: if, as Anderson alleged, the OCCA had applied Rule 9.7(G)(3) in an inconsistent fashion, Anderson should be required to file a successor application for state post-conviction relief, even in the face of the OCCA's denial of the request for time to prepare such an application, because the OCCA might still exercise its discretion to review the application on the merits. Oklahoma did not address or contradict, in any fashion, Anderson's claim the OCCA had not applied Rule 9.7(G)(3) in a regular or consistent fashion.

The district court was unconvinced by Oklahoma's arguments regarding exhaustion and procedural bar of Anderson's ineffective assistance claim. The district court began by noting that once exhaustion becomes futile, it is no longer required. 28 U.S.C. § 2254(b)(1)(B); *James v. Gibson*, 211 F.3d 543, 550 (10th Cir. 2000). In its order denying Miller's request for time to prepare a second state application for post-conviction relief, the OCCA had clearly stated that any such application would be barred by application of Rule 9.7(G)(3). Because it

-10-

would have been futile for Anderson to have proceeded to file a second application for post-conviction relief in these circumstances, the district court concluded Anderson's claim of ineffective assistance during the penalty phase of this trial was effectively exhausted or excused from exhaustion.

Having so concluded, the district court moved on to consider whether that claim was procedurally barred. *See James*, 211 F.3d at 550 ("Even if failure to exhaust is excused, however, . . . claims may otherwise be procedurally barred."). The district court recognized the OCCA had treated the claim as procedurally barred, pursuant to Rule 9.7(G)(3), in its order denying Miller time to prepare a second state application. In his Motion to Restore, however, Anderson had placed the adequacy of Rule 9.7(G)(3) at issue by citing numerous cases in which that procedural bar was not evenhandedly applied. Thus, the burden was on Oklahoma to prove the adequacy of Rule 9.7(G)(3). *Hooks v. Ward*, 184 F.3d 1206, 1217 (10th Cir. 1999). Because Oklahoma had never offered up a defense of the adequacy of Rule 9.7(G), the district court ruled it was "unable to conclude that Rule 9.7(G) is applied evenhandedly in the vast majority of cases." *Anderson*, No. CIV-01-177-M, slip op. at 43. Accordingly, the district court concluded Anderson's claim of ineffective assistance of counsel was exhausted, but not procedurally barred, and proceeded to decide the issue on the merits.

As to the merits, the district court applied the governing framework from *Strickland v. Washington*, 466 U.S. 668 (1984), and concluded Anderson was not

-11-

entitled to habeas relief. The district court first concluded trial counsel had rendered deficient performance in failing to investigate and prepare an adequate case in mitigation for the penalty phase of Anderson's trial. Nevertheless, the district court concluded Anderson had not demonstrated he was prejudiced by counsel's deficient performance. In particular, the district court concluded the prosecution case was strong, Anderson had been found guilty of participating in the murder of three individuals, and the jury had found the existence of three aggravating circumstances. In light of these factors, the district court concluded Anderson had not demonstrated a reasonable probability the outcome of the penalty phase would have been different if the additional mitigation evidence identified by Anderson would have been presented at trial.

Anderson appeals, asserting, *inter alia*, the district court erred in denying him habeas relief on his claim of ineffective assistance during the penalty phase of his trial.

### III. DISCUSSION

*A. Exhaustion/Procedural Bar*

Oklahoma argues on appeal that Anderson's ineffective assistance of trial counsel claim is both unexhausted and procedurally barred. In particular, Oklahoma asserts that to properly exhaust the claim, Anderson was required to file a successive application for post-conviction relief raising such a claim in the

-12-

OCCA despite the OCCA's denial of Anderson's request for an extension to prepare an application. Having failed to file such an application, Oklahoma asserts the claim is not only unexhausted, but also subject to application of an anticipatory procedural bar.

"There is a 'strong presumption' in favor of requiring exhaustion of state remedies." *Beavers v. Saffle*, 216 F.3d 918, 924 n.3 (10th Cir. 2000). Nevertheless, this court has recognized a narrow exception to the exhaustion requirement where "[f]urther state court proceedings would be futile." *Bear v. Boone*, 173 F.3d 782, 785 (10th Cir. 1999). A review of the order of the OCCA denying Anderson's request for time to prepare a successive application for post-conviction relief demonstrates this is one of those unusual cases in which further proceedings in state court would most assuredly have been futile. Accordingly, Anderson was not required to file such an application to exhaust his state court remedies.

As noted above, within a week of contracting with OIDS to represent Anderson in the filing of a successive state application for post-conviction relief, Miller filed the Notice in the OCCA setting out the complicated procedural history of Anderson's case and requesting time to prepare an adequate post-conviction application raising the issue of trial counsel's ineffective assistance

during the penalty phase of the trial.[6]  In denying that request, the OCCA made absolutely clear that because any such successor application Anderson could potentially file in state court would be barred by application of Rule 9.7(G)(3), no extension was necessary.  In its order denying the Notice, the OCCA began by noting that Anderson's request for additional time to file a successive application

---

[6]As an apparent corollary to its argument that Anderson did not exhaust his ineffective assistance of counsel claim because he did not ultimately file a successive application for post-conviction relief, Oklahoma asserts Miller was obligated to file such an application immediately upon her appointment based solely upon the material developed by federal habeas counsel.  According to Oklahoma, her failure to do so should weigh against a determination that actually filing such a petition would have been futile.  The problem with Oklahoma's assertion is two-fold.  First, Oklahoma's assertion Miller was obligated to proceed with the filing of a successive application for post-conviction relief without undertaking any investigation of the factual and/or legal basis of such an application is squarely at odds with Oklahoma law.  Okla. Stat. Ann. tit. 22, § 1088.1(A) (providing that by "signing, filing, submitting, or later advocating" an application for post-conviction relief, an attorney is certifying that "to the best of the [attorney's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that the factual assertions have evidentiary support and the legal contentions are "warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law"); *id.* § 1088.1(B) (providing for the imposition of sanction on attorneys that fail to comply with the requirements of § 1088.1(A)).  Second, as set out below, there is nothing in the order of the OCCA denying the Notice indicating that if Miller proceeded in the manner suggested by Oklahoma, the OCCA would have considered such an application on the merits.  Instead, it is absolutely clear that the OCCA denied Miller's request for time to adequately investigate and prepare a successive application for post-conviction relief because any such application would be time barred under Rule 9.7(G)(3).  Miller's decision not to proceed on the reckless course now advocated by Oklahoma has no bearing on the question whether it would have been futile to file a successive application for post-conviction relief in light of the order of the OCCA denying Miller's request for adequate time to prepare such an application.

-14-

for post-conviction relief fell "under the authority of 22 O.S. 2001, § 1089(D)(2) & (8) and Rule 9.7(G), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, app. (2002)." The OCCA further noted that under subsection three of Rule 9.7(G), it would not consider a subsequent application for post-conviction relief unless such application is filed within sixty days of the discovery of the factual basis supporting the new claim for relief. With that as background, the OCCA concluded as follows:

> The motion before this Court avers that Petitioner filed a petition for writ of habeas corpus in the United States District Court for the Western District of Oklahoma and during the course of preparing for his habeas petition, counsel found that trial counsel had failed to investigate relevant mitigating evidence. Accordingly, Petitioner's habeas counsel requested the federal court excuse Petitioner's failure to raise the ineffective assistance of counsel issue earlier. The federal judge issued an order holding the habeas petition in abeyance pending exhaustion in state court of the unexhausted claim. Accordingly, petitioner's counsel has requested this Court to grant him four months in which to review, investigate and prepare an adequate successor post-conviction application.
>
> Petitioner admits that the evidence he seeks to discover was readily available and discoverable by direct appeal counsel. The rules applicable to post-conviction, require filing within sixty days "from the date the previously unavailable legal or factual basis serving as the basis for a new issue is announced or discovered." Petitioner's claim that he should be excused from this rule as failure to review the potential claims would result in a miscarriage of justice is not persuasive considering his federal court filings and nearly three-year delay in filing for subsequent post-conviction relief.
>
> Petitioner's motion for extension of time to file a successor application for post-conviction relief is hereby **DENIED**.

As this passage makes crystal clear, the OCCA denied Anderson's request for additional time to prepare an adequate successor application for post-

-15-

conviction relief because any such petition would be barred from review under the terms of Rule 9.7(G)(3). Thus, there is a definitive ruling from the state court that it will not review on the merits a successor application from Anderson raising a claim that trial counsel was ineffective during the penalty phase for failing to develop an adequate case in mitigation. Because Anderson was not required to undertake a meaningless and utterly futile act to properly exhaust his state court remedies, *Beavers*, 216 F.3d at 924 n.3; *Bear*, 173 F.3d at 785, this court rejects Oklahoma's contention that Anderson was required to nevertheless file a successor application for post-conviction relief to exhaust his ineffective assistance claim. Thus, like the district court, we conclude Anderson's claim of ineffective assistance of trial counsel during the penalty phase is exhausted.

Having concluded Anderson's ineffective assistance claim is exhausted, this court must next consider whether the claim is nevertheless procedurally barred. *Clayton v. Gibson*, 199 F.3d 1162, 1170 (10th Cir. 1999). The procedural bar question is complicated, however, by Oklahoma's dogged insistence that Anderson's ineffective assistance claim is unexhausted. Building on that faulty foundation, Oklahoma further insists this court should apply an anticipatory procedural bar[7] because Anderson's claim of ineffective assistance of trial

_____

[7]"'Anticipatory procedural bar' occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it." *Moore v.*

(continued...)

-16-

counsel during the penalty phase of the trial would be procedurally barred under

Okla Stat. Ann tit. 22, §§ 1086, 1089(D)(2)[8] upon return to state court. *See*

*Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

The problem with Oklahoma's argument is that, as detailed above,

Anderson's claim of ineffective assistance is exhausted precisely because the

OCCA has clearly and unequivocally stated the claim is barred by Rule 9.7(G)(3).

The state procedural rule actually identified and applied by the OCCA to bar

review of Anderson's claim is entirely distinct from the rule identified by

Oklahoma as potentially applying on an anticipatory basis. Because Oklahoma

has never countenanced the possibility that Anderson's ineffective assistance

claim is actually exhausted or wavered from its position that the state procedural

bars set out in §§ 1086 and 1089(D)(2) should apply anticipatorily, it has never

addressed the adequacy of Rule 9.7(G)(3), the procedural bar actually applied by

the OCCA. *But cf. Johnson*, 486 U.S. at 587-89 (reviewing whether procedural

bar actually applied by state court was adequate to bar federal court habeas

review of a claim set out in 28 U.S.C. § 2254). As did the district court, we

---

[7](...continued)
*Schoeman*, 288 F.3d 1231, 1233 n.3 (10th Cir. 2002).

[8]These rules, taken together, provide that all grounds for relief, both those actually known and those which should have been known through the exercise of due diligence, must be brought in an initial application for post-conviction relief. Any claims not asserted in compliance with this rule are thereafter waived. Okla. Stat. Ann. tit. 22, §§ 1086, 1089(D)(2).

conclude Oklahoma's refusal to defend the adequacy of the procedural bar actually applied by the OCCA leaves this court with no choice but to proceed to the merits of Anderson's claim of ineffective assistance of trial counsel.

"On habeas review, this court does not address issues that have been defaulted in state court on an independent and adequate state procedural ground, unless the petitioner can demonstrate cause and prejudice or a fundamental miscarriage of justice." *English v. Cody*, 146 F.3d 1257, 1259 (10th Cir. 1998). The independence of Rule 9.7(G)(3) is not at issue in this case. Anderson has, however, challenged the adequacy of that rule. "[T]o be adequate, a state rule of procedural default must be applied evenhandedly in the vast majority of cases." *Id.*; *see also Johnson*, 486 U.S. at 587 (holding that a state procedural rule in not "adequate" to bar federal habeas review unless the rule "is strictly or regularly followed" (quotations omitted)). "Because the effective assistance of counsel lies at the very foundation of the adversary system of criminal justice, this court has been particularly vigilant in scrutinizing the adequacy of state rules of procedural default which have the effect of barring federal habeas review of claims of ineffective assistance of counsel." *English*, 146 F.3d at 1259.

Before the district court, Anderson cited multiple instances in which the OCCA had declined to apply the procedural bar set out in Rule 9.7(G)(3) in situations assertedly similar to his. Anderson also noted the OCCA had previously held it had the power to grant relief, despite the plain time limits set

out in Rule 9.7(G)(3), when to do so was necessary to avoid a miscarriage of justice. *Valdez v. State*, 46 P.3d 703, 710-11 (Okla. Crim. App. 2002). Taken together, Anderson asserted these two facts rendered Rule 9.7(G)(3) inadequate to bar federal habeas review of his ineffective assistance claim. *English*, 146 F.3d at 1259 (to be adequate to bar federal habeas review, a state procedural rule "must be applied evenhandedly in the vast majority of cases"); *Gutierrez v. Moriarty*, 922 F.2d 1464, 1470 (10th Cir. 1991) (holding that a state court's assertion of discretion to waive a procedural rule militates against concluding the rule is adequate). Anderson reasserts these arguments on appeal.

Because Anderson came forward with specific allegations as to the inadequacy of Rule 9.7(G)(3), the burden shifted to Oklahoma to prove the adequacy of the Rule to bar federal habeas review. *Hooks*, 184 F.3d at 1217. Oklahoma has made no attempt, either before the district court or this court, to defend the adequacy of Rule 9.7(G)(3). Accordingly, under the particular circumstances of this case, we conclude Rule 9.7(G)(3) is not adequate to bar federal habeas review of Anderson's claim of ineffective assistance. Thus, we proceed to the merits of the claim.[9]

_____

[9]Even if Oklahoma was correct in asserting that §§ 1086 and 1089(D)(2) should apply anticipatorily, a substantial question would remain as to whether those separate procedural rules are themselves adequate to bar review of Anderson's claim. In addition to considering a state procedural bar inadequate when it is inconsistently applied, this court also considers a state procedural bar

(continued...)

inadequate if "it deprives a defendant of any meaningful review of his claims." *Spears v. Mullin*, 343 F.3d 1215, 1253-54 (10th Cir. 2003). A defendant has no opportunity for meaningful review of an asserted ground for relief if the ground could not have been raised within a state's procedural rules. Here, Oklahoma's procedural rules bar post-conviction relief of any claims that were not raised on direct appeal, *see* Okla. Stat. Ann. tit. 22, § 1086, as well as any claims that were not raised in an initial application for post-conviction relief. *See id.* §§ 1086, 1089(D)(2). On the facts before this court, there is a serious question whether Anderson could have raised his ineffective trial counsel argument within these rules.

Anderson argues persuasively that he could not have raised this ground on direct appeal or in his first habeas petition because his appellate counsel operated under a conflict of interest. This conflict of interest arose because Anderson's appellate and post-conviction counsel represented both Anderson and his co-defendant, Thornburg. As a result of this co-representation, Anderson's appellate/post-conviction counsel were bound by a duty to Thornburg that precluded them from effectively representing Anderson by, for example, presenting a relative culpability theory based on Anderson's limited mental abilities.

Two cases are instructive. *See Cuyler v. Sullivan*, 446 U.S. 335 (1980); *Jennings v. Purkett*, 7 F.3d 779 (8th Cir. 1993). In *Cuyler*, the Supreme Court held that a "conflict itself demonstrat[es] a denial of the right to have the effective assistance of counsel." 446 U.S. at 349 (quotation omitted). "Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Id.* at 349-50. There is no concomitant constitutional right to effective assistance of post-conviction counsel, *see Coleman v. Thompson*, 501 U.S. 722, 752 (1991), but there is a constitutional right to effective counsel on direct appeal when a state provides for an appeal. Because a defendant bears the risk of attorney error that results in a procedural default at the post-conviction stage, ineffective assistance of post-conviction counsel cannot excuse a state procedural bar. *See id.* at 752-54. The Eighth Circuit, however, has held that "[a]n attorney's conflict of interest," potentially including a post-conviction counsel's conflict, "may be external to his client's defense, and thus a basis for finding cause" to excuse procedural default. *See Jennings*, 7 F.3d at 782.

Here, it appears Anderson's appellate and post-conviction counsel actively represented conflicting interests by representing both Anderson and Thornburg.

(continued...)

-20-

*B. Merits*

A claim by a habeas petitioner "that counsel's assistance was so defective as to require reversal of a . . . death sentence has two components." *Strickland*, 466 U.S. at 687. "To be entitled to relief, a petitioner must prove both that his counsel's performance was deficient and that the deficient performance prejudiced his defense." *Bryan v. Mullin*, 335 F.3d 1207, 1216 (10th Cir. 2003) (en banc).

> To carry his burden of demonstrating that counsel's performance was deficient, a petitioner must show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. To carry his burden of demonstrating prejudice, a petitioner must show that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* (quotations and citations omitted). This court is "particularly vigilant" in ensuring the right to effective assistance of counsel when a defendant is subject to a sentence of death. *Smith v. Mullin*, 379 F.3d 919, 938 (10th Cir. 2004); *see also Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997) ("In assessing

---

[9](...continued)
This conflict of interest may very well have prevented Anderson from raising his ineffective trial counsel claim on direct appeal or in an application for post-conviction relief and, consequently, within Oklahoma's procedural rules. Therefore, a strong argument can be made that those rules deprived Anderson of any meaningful review of that claim. This court need not definitively decide this issue, however, because, as noted above, the procedural rule actually applied by the OCCA is not effective to bar review of Anderson's claim.

counsel's conduct, we are mindful of the Supreme Court's observation that '[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.'" (quoting *Burger v. Kemp*, 483 U.S. 776, 785 (1987)).

Because Anderson's ineffective assistance claim was not decided on the merits by the OCCA, and because it is not procedurally barred, federal habeas review of the claim is *de novo*. *Torres v. Lytle*, 461 F.3d 1303, 1311 (10th Cir. 2006). Upon *de novo* review, the district court concluded that although Anderson's trial counsel rendered constitutionally deficient performance during the penalty phase of the trial, Anderson did not suffer prejudice as a result of the deficient performance. "[T]his court . . . reviews *de novo* whether counsel's performance was legally deficient and whether the deficiencies prejudiced the [petitioner]." *Bryan*, 335 F.3d at 1216. As the district court did not conduct an evidentiary hearing, but instead decided the case on the record presented by the parties, this court independently reviews the facts relating to counsel's performance and prejudice. *Allen v. Mullin*, 368 F.3d 1220, 1234 (10th Cir. 2004).

*1. Performance*

"The sentencing stage is the most critical phase of a death penalty case. Any competent counsel knows the importance of thoroughly investigating and

presenting mitigating evidence." *Romano v. Gibson*, 239 F.3d 1156, 1180 (10th Cir. 2001). To perform adequately in a capital case, trial counsel must undertake "'to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) (1989) [hereinafter 1989 Guidelines]); *see also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 10.7(A) (2003) [hereinafter 2003 Guidelines]. Counsel should consider, *inter alia*, medical history, educational history, social and family history, religious and cultural influences, and employment. *See* 2003 Guidelines 10.7, Commentary.

Anderson contends trial counsel wholly failed to investigate potential mitigation evidence, instead focusing almost exclusively on the guilt phase of the trial. The result, according to Anderson was that trial counsel failed to adduce at trial substantial amounts of mitigating evidence and failed to adequately rebut the case in aggravation presented by the prosecution. The district court agreed, concluding "the investigation conducted in preparation for the second phase of [Anderson's] trial fell below prevailing professional norms." *Anderson*, No. CIV-01-177-M, slip op. at 48. "[C]ognizant of the overwhelming importance of the role mitigation evidence plays in the just imposition of the death penalty," *Smith*, 379 F.3d at 939, this court agrees with the district court and concludes trial

counsel's failure to investigate and discover readily available mitigation evidence amounted to constitutionally deficient performance.

Although trial counsel was provided with two investigators, one of whom was dedicated to investigating the case in mitigation, the evidence before the district court reveals trial counsel directed his attention almost exclusively to the guilt phase of the trial. Dennis Berglan, the guilt phase investigator, met with trial counsel on many occasions, detailed his investigation in extensive reports to trial counsel, and personally met with Anderson on numerous occasions. In contrast, James Grace, the penalty phase investigator, spent only twenty-three hours in substantive investigation, all of which was undertaken in the month before trial. *But see* 2003 Guidelines 10.7 Commentary ("The mitigation investigation should begin as quickly as possible, because it may affect the investigation of first phase defenses . . . , decisions about the need for expert evaluations . . . , motion practice, and plea negotiations."). Trial counsel did not have Grace interview Anderson.[10] *But see id.* ("[I]mmediately upon counsel's

_____

[10]Grace found this aspect of his investigation particularly troubling. According to Grace,

In order to obtain [] life history information, it is essential to conduct a number of detailed meetings with the client. Initially and throughout the course of the case, it is important to develop and maintain a rapport with the client to instill trust. The development of this trust is critical in order for the mitigation investigator to draw out vital information about the client's upbringing, which often includes sensitive and sometimes embarrassing facts that are relevant

(continued...)

entry into the case appropriate member(s) of the defense teams should meet with the client" to begin to build a case in mitigation).  Grace did not have access to life-history information, school records, or medical records.  *But see id.* (specifically noting the relevance and importance of each of these avenues of investigation).  Anderson was not evaluated by any mental health or other expert qualified to ascertain whether Anderson suffered from neurological or other deficits that would mitigate his moral culpability.  *Smith*, 379 F.3d at 942 (noting the "vital importance" of mental health evidence "to the jury's decision at the punishment phase" (quoting 2003 Guidelines 1.1, 4.1, 10.4, 10.7, 10.11)).  Ultimately, based on his extensive experience in conducting mitigation investigations in death penalty cases, Grace concluded he had "never had an experience like [he] had while working on [Anderson's] case.  The mitigation investigation that [he] was conducted to do by [trial counsel] was minimal at best and in [his] opinion was wholly inadequate."

The evidence submitted to the district court demonstrates mitigation evidence of the kind and magnitude identified as particularly important in the cases and 1989 and 2003 Guidelines was readily available and discoverable through a reasonable investigation.  The record developed on habeas review reveals as follows:

---

[10](...continued)
to the client's character and personality.

*1. Family History.* Anderson was raised in an environment of neglect and abuse. He was the twelfth of thirteen children. By the time he was born, his parents lacked interest in raising their children. Instead, they turned to their own addictions to alcohol, leaving Anderson's older siblings to provide what care they could. Anderson's mother was abusive to both her children and husband. To discipline the children, including Anderson, she would "whip [them] with hangers and extension cords." Anderson's mother and step-father engaged in "horrible drunken fights" in front of the children. Anderson's mother, who was eleven years younger than Anderson's father, eventually grew bored of her role as homemaker and began having illicit affairs in the family home. Men from the nearby Air Force base, referred to as the Anderson children's "uncles," would come to the family home to have sex with Anderson's mother, while Anderson's father was at work. The illicit affairs led all the Anderson children, from an early age, to question their parentage; these questions undermined the children's sense of security and self-esteem.

*2. Mental Health History.* Anderson suffers from brain damage. He is "borderline mentally defective" with full scale IQ scores in the 70s. Because of his brain damage, Anderson functions below 97 to 98% of the general population. Anderson's brain damage likely resulted from multiple etiologies: (a) abuse of inhalants by sniffing paint as a child; (b) abuse of alcohol from the time he was 9 years old; (c) abuse of marijuana and other drugs from the time he was 9 years

old; (d) chronic addiction to and abuse of methamphetamine; and (e) repeated head injuries as a child and as an adult, a number of which resulted in periods of unconsciousness. Anderson's brain deficits affect his reasoning, problem solving, and judgment. These deficits can be perceived by lay persons as "meanness" or antisocial behavior, but with expert evaluation and explanation are properly explained as deriving from disruption and impairments to the nervous system.

*3. Drug Usage.* Use of methamphetamine would serve to exacerbate Anderson's existing deficits and impairments. Anderson, however, attempted to overcome his addiction to methamphetamine twice without the benefit of formal treatment or counseling. One of these episodes came about as part of a serious religious conversion and was in association with consideration on the part of Anderson about becoming a preacher. Nevertheless, his co-dependent relationship with his wife, who never gave up her use of methamphetamine, eventually caused him to relapse into drug abuse.

As the various iterations of the ABA Guidelines and *Wiggins* make clear, this is just the kind of mitigation evidence trial counsel is obligated to investigate and develop as part of building an effective case in mitigation during the penalty phase of a trial. 2003 Guidelines 10.7; *Wiggins*, 539 U.S. at 522, 524. Berglan's and Grace's declarations reveal, however, that trial counsel undertook only the most rudimentary investigation of Anderson's background, choosing to focus his investigatory efforts almost exclusively on the guilt phase of the trial. As a

result, counsel was unable to muster an adequate defense to the prosecution's case in aggravation. Instead, trial counsel was limited to presenting to the jury: (1) evidence that although Anderson had a drug and alcohol problem, he had worked and provided for his family; (2) he was the son of a "good woman" and had a family that loved him; (3) his daughter loved him and he could be of help to her from prison. Thus, rather than offering the jury a potential explanation for Anderson's actions relating to the murders he participated in, trial counsel's case in mitigation was limited to a simple plea for mercy. *Smith*, 379 F.3d at 943 (noting importance of mitigation evidence that explains to the jury why a defendant acted as he did); *see also Williams v. Taylor*, 529 U.S. 362, 415 (2000) (O'Connor, J., concurring) (noting importance of presenting case in mitigation centered on a defendant's "unique personal circumstances," as opposed to a generic request for mercy). Like the district court, we have no difficulty concluding trial counsel's failure to investigate and obtain the readily available evidence in mitigation set out above, and the concomitant necessity of presenting only the most skeletal case in mitigation, fell well below the prevailing professional norms and amounted to deficient performance.

In response, Oklahoma simply asserts that because Anderson did not proffer an affidavit from trial counsel concerning what investigation might have been conducted apart from that performed by Grace, Anderson failed to overcome the presumption that trial counsel's case in mitigation fell within the wide range

-28-

of reasonable professional assistance.[11]  Oklahoma's assertion is wrong both as a matter of fact and as a matter of law.

The Supreme Court has squarely rejected the notion that, when counsel has "*some* information with respect to petitioner's background," counsel has necessarily fulfilled his constitutional duty to investigate and present a case in mitigation.  *Wiggins*, 539 U.S. at 527. Moreover, although Oklahoma is quite correct in asserting that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable," *Strickland*, 466 U.S. at 690, the question in this particular case is not whether trial counsel made a tactical or strategic decision not to include the omitted mitigation evidence at trial, but rather whether "the investigation supporting counsel's decision . . . *was itself reasonable*."  *Wiggins*, 539 U.S. at 523.

---

[11]Surprisingly, the entirety of Oklahoma's briefing on the question of trial counsel's performance amounts to less than a single paragraph.  According to Oklahoma,

> [Anderson's] assertion that there was an inadequate investigation is speculation where he did not proffer an affidavit from trial counsel concerning what investigation he conducted apart from that done by his investigator.  He cannot show that lack of sufficient information rendered any strategic decisions as to what mitigating evidence to present deficient performance, especially where he has the burden to overcome the strong presumption that counsel's strategy and tactics fell within the wide range of reasonable professional assistance.  *Strickland*, 466 U.S. at 689.

Appellant's Br. at 27.

The only evidence in the record is that Anderson's family background, mental health, and neurological health were never investigated by trial counsel. As noted above, Grace's affidavit details the extremely limited investigation he conducted on behalf of counsel in the month before the trial. Grace's declaration does not, however, stand alone. The record also contains a declaration by Kim Marks, an investigator with the Federal Public Defender's Office in the Western District of Oklahoma. Marks' declaration demonstrates he has extensive experience in investigating mitigating evidence in death penalty cases. Marks examined trial counsel's records; that examination revealed no educational records, medical records, or psychological evaluations were gathered in preparation for trial. Taken together, the declarations of Grace and Marks make clear that trial counsel simply did not undertake an investigation into potential evidence in mitigation sufficient to satisfy the prevailing norms in the profession as set out in the 1989 or 2003 Guidelines. Trial counsel did not undertake a strategic decision in this case to omit the mitigation evidence identified above; counsel simply did not investigate and therefore did not know such evidence was available. *See Hooper v. Mullin*, 314 F.3d 1162, 1170-71 (10th Cir. 2002) (failure to pursue reasonable avenues of investigation without any idea of what the investigation might reveal was not an informed strategic decision and required relief from sentence of death); *Pavel v. Hollins*, 261 F.3d 210, 218 n.11 (2d Cir. 2001) (collecting cases and discussing how decisions made in ignorance of

-30-

relevant facts and law cannot be characterized as strategic under *Strickland*); *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990) ("Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum."); *Profitt v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987) (noting that the "usual deference to tactical decisions is not relevant" when the decisions are based on "information that was faulty because of . . . ineffective investigatory steps").

*2. Prejudice*

Based on the strength of the state's case, Anderson's convictions for participating in three murders, and the jury's findings of the existence of three aggravating circumstances, the district court concluded Anderson was not prejudiced by trial counsel's failure to investigate and present an adequate case in mitigation during the penalty phase of the trial.

> In considering *Strickland*'s prejudice prong, "we evaluate the totality of the evidence—both that adduced at trial, and the evidence adduced in habeas proceedings." *Wiggins*, 123 S. Ct. at 2543 (italics, quotations, and citations omitted). In order to grant relief, we must discern a reasonable probability that the jury would have concluded the "balance of aggravating and mitigating circumstances did not warrant death." *Mayes*, 210 F.3d at 1290. A "reasonable probability" is less than a preponderance of the evidence, but "sufficient to undermine confidence in the outcome." *Fisher*, 282 F.3d at 1307 (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. 2052).

*Smith*, 379 F.3d at 942. Taking guidance from the Supreme Court's decisions in *Wiggins* and *Williams*, and from this court's decision in *Smith*, we disagree with

the district court and conclude Anderson has demonstrated a reasonable probability that but for trial counsel's deficient performance, the outcome of the penalty phase would have been different.

There is no doubt that the multiple murders in this case were callous and brutal. The district court was also correct in noting that the case against Anderson on the question of guilt was strong, and included information that Anderson had corresponded with his wife about keeping potential witnesses away from the trial or "taking care" of them. In fact, the strength of the prosecution's case during the guilt phase left no room for the question of residual doubt during the penalty phase. In addition to all of the first stage evidence, the prosecution adduced testimony during the penalty phase that while incarcerated awaiting trial on the murder charges, Anderson had obtained illegal drugs and had been found in possession of a knife. It is similarly true that among the three murders, the jury found the existence of three aggravating circumstances: (1) the murders were especially heinous, atrocious, or cruel; (2) there was a probability Anderson would commit future criminal acts of violence that would constitute a continuing threat to society; and (3) that the murders of Smith and Shepard were committed for the purpose of avoiding or preventing a lawful arrest or prosecution.

Against this backdrop, trial counsel mounted an extraordinarily limited case in mitigation. As noted above, trial counsel adduced the testimony of Anderson's family and co-workers to support the theory that Anderson was a kind, hard-

working, normal man who could be of some help to his daughter if his life were spared. Unfortunately, the case in mitigation presented by trial counsel played into the prosecution's theory that the only explanation for the murders was that Anderson was simply an "evil" man. The prosecution seized on Anderson's case in mitigation to assert during closing arguments that there was no excuse for Anderson's conduct because he grew up in a "good family" and was never abused as a child. Thus, relying on the exceedingly limited nature of trial counsel's case in mitigation, the prosecution was able to argue convincingly to the jury that there was nothing in the case to diminish Anderson's moral culpability for the murders.

As set out at length above, however, there existed readily available evidence which could have both explained to the jury the reasons Anderson was predisposed to act in concert with Thornburg and Embrey on the night of the murders and demonstrated Anderson was less morally culpable than the average defendant for committing the murders. In particular, Anderson grew up in poverty, the twelfth child of a physically and emotionally abusive mother. Anderson's mother's disregard for her marriage and inattention to her children created "dysfunctional patterns in their development, including a pattern of dropping out of school, a pattern of leaving home at an early age, and a pattern of teenage pregnancy and/or marriage before the age of 18." The jury would have learned that Anderson's life followed each of these patterns. The evidence developed by habeas counsel demonstrates Anderson suffers from brain damage;

is "borderline mentally defective"; and functions below the bottom two percent of the general population. Anderson was only able to complete the eighth grade of school. The most significant damage to Anderson's brain is in the area of the frontal lobe, the area of the brain that affects reasoning, problem solving, and judgment. Anderson has suffered chronic drug addiction, which addiction began at the age of nine with the use of alcohol, marijuana, and inhalants and ultimately progressed to the use of methamphetamine. The use of amphetamines exacerbates Anderson's mental deficits and impairments. Anderson has tried to overcome his addiction to methamphetamine, but without the support of his wife those efforts ultimately failed. Despite these serious impairments, Anderson had no history of criminal violence prior to the murders in question. Likewise, his family considered him a loving man, who always cared for his family and children and worked hard to support them.

In *Smith*, this court noted that this type of evidence "is exactly the sort of evidence that garners the most sympathy from jurors." 379 F.3d at 942 (citing both empirical evidence and case law). The Supreme Court has similarly noted that evidence of borderline mental retardation and childhood poverty and abuse are highly relevant to the question of moral culpability. *Williams*, 529 U.S. at 398; *see also Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a

-34-

disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse." (quotation omitted)), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *Wiggins*, 539 U.S. at 535 (quoting *Penry*). Evidence of the type set out above serves to humanize a defendant and explain why an otherwise kind and loving family man can come to participate in a violent, murderous event. *See Smith*, 379 F.3d at 943. Accordingly, this court cannot overstate the importance of the type of evidence that was available in this case but was never presented to the jury.

In this particular case, the absence of this readily available mitigation evidence left the jury with no explanation for the murders other than the prosecution's assertion Anderson was "evil." Although the case against Anderson was strong and the murders in this case were horrific, courts have not hesitated to grant relief in similar circumstances where the absence of available mitigation evidence left the jury with a "pitifully incomplete" picture of the defendant. *Id.* at 944 (discussing *Williams* and *Wiggins*). Had the jury been presented a complete picture of Anderson's background and history, there is a reasonable probability at least one juror would have struck a different balance between the mitigating and aggravating factors. *See* Okla. Stat. tit. 21, § 701.11 (providing that the jury must be unanimous to impose the death penalty). Accordingly, Anderson has carried his burden of demonstrating he received ineffective

assistance of counsel during the sentencing phase of his trial and is entitled to relief under *Strickland*, 466 U.S. at 694.

## IV. CONCLUSION

The order of the district court denying Anderson's writ of habeas corpus as to his death sentence is hereby **REVERSED**. The matter is remanded to the district court to grant the writ with regard to Anderson's death sentence and order Oklahoma to resentence Anderson within a reasonable time of the issuance of the judgment.