**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 7, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EMMANUEL LITTLEJOHN,

      Petitioner - Appellant,

v.

TERRY ROYAL, Warden, Oklahoma State
Penitentiary,[*]

      Respondent - Appellee.

No. 14-6177

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:05-CV-00225-M)**

---

Sarah M. Jernigan, Assistant Federal Public Defender (Randy A. Bauman, Assistant Federal Public Defender, with her on the briefs), Oklahoma City, Oklahoma, for Petitioner-Appellant.

Robert L. Whittaker, Assistant Attorney General (E. Scott Pruitt, Attorney General, with him on the brief), Office of the Attorney General for the State of Oklahoma, Oklahoma City, Oklahoma, for Respondent-Appellee.

---

Before **TYMKOVICH**, Chief Judge, **LUCERO** and **HOLMES**, Circuit Judges.

---

[*]     Pursuant to Fed. R. App. P. 43(c)(2), Terry Royal, the current Warden of the Oklahoma State Penitentiary, is automatically substituted for Anita Trammell as Respondent in this case.

**HOLMES**, Circuit Judge.

Following various Oklahoma state-court proceedings, an Oklahoma jury convicted Emmanuel Littlejohn of first-degree murder and sentenced him to death. This case—which comes before us for a second time—arises from the district court's denial of Mr. Littlejohn's petition for a writ of habeas corpus under 28 U.S.C. § 2254.

The first time around the district court found Mr. Littlejohn's ineffective-assistance and cumulative-error claims—among twelve other bases for relief—meritless or procedurally barred. Reviewing the district court's conclusions de novo, we addressed the declaration of Dr. Manual Saint Martin, a psychiatrist who diagnosed Mr. Littlejohn—for the first time—with undefined, synapse-level neurological deficits, or an organic brain disorder. Given that evidence, we reasoned that the disposition of Mr. Littlejohn's ineffective-assistance claim—and, derivatively, his cumulative-error claim—hinged on whether Dr. Saint Martin's averments would prove worthy of belief, because "[e]vidence that an organic brain disorder was a substantial factor in engendering Mr. Littlejohn's life of deviance probably would have been a significant favorable input for Mr. Littlejohn in the jury's decisionmaking calculus" during the penalty phase. *Littlejohn v. Trammell (Littlejohn I)*, 704 F.3d 817, 864 (10th Cir. 2013). As a result, we remanded the case to the district court for an evidentiary hearing

2

on whether Mr. Littlejohn's trial counsel proved ineffective by failing to adequately investigate and present to the jury a mitigation theory of organic brain damage.

On remand, the district court held an evidentiary hearing; the parties presented the testimony of various individuals—including Dr. Saint Martin and Mr. Littlejohn's trial counsel, James Rowan. Following the hearing, the district court largely restated its earlier findings and again denied Mr. Littlejohn habeas relief on his ineffective-assistance and cumulative-error claims. Mr. Littlejohn now appeals from the district court's judgment on remand. With the benefit of a more robust factual record relative to Mr. Littlejohn's alleged organic brain damage, for the reasons that follow, we **affirm**.

## I

In *Littlejohn I*, we detailed the factual and procedural backdrop of Mr. Littlejohn's state-court conviction and sentencing. *See* 704 F.3d at 822–24. In brief, in 1992, Mr. Littlejohn and his acquaintance Glenn Bethany robbed a convenience store in Oklahoma City. As the robbery neared its conclusion, one of the store's employees—Kenneth Meers—took a fatal shot to the face. Although Mr. Littlejohn maintained that he did not fire the fatal shot, a jury convicted him of first-degree murder and sentenced him to death in 1994. In 1998, however, the Oklahoma Court of Criminal Appeals ("OCCA") vacated and remanded his initial death sentence, because the trial court improperly admitted

3

uncorroborated testimony suggesting that Mr. Littlejohn had confessed to the killing of Mr. Meers and also an unrelated murder. *See Littlejohn v. State*, 989 P.2d 901, 910–12 (Okla. Crim. App. 1998). At resentencing, a jury again sentenced Mr. Littlejohn to death, based on two aggravating circumstances: (1) his previous conviction for a violent felony, and (2) the fact that he posed a continuing threat to society.

Following Mr. Littlejohn's unsuccessful efforts for state post-conviction relief, he filed a habeas petition under 28 U.S.C. § 2254 in federal district court. *See Littlejohn v. Workman*, No. CIV-05-225-M, 2010 WL 2218230 (W.D. Okla. May 27, 2010) (unpublished). As relevant here, he argued that (1) the prosecution violated his due process rights by failing to give adequate notice of certain evidence it intended to present at resentencing in support of the continuing-threat aggravator; (2) the introduction of the testimony of two witnesses violated his rights under the Confrontation Clause, because the prosecution failed to make the necessary showing of unavailability; (3) his trial counsel had been constitutionally ineffective for failing to investigate and present evidence of his organic brain damage; and (4) the cumulative weight of these errors entitled him to relief.

The district court denied Mr. Littlejohn's petition, and he brought his first appeal. In *Littlejohn I*, we affirmed the district court's disposition of Mr. Littlejohn's due-process and Confrontation Clause claims, but reversed the

4

district court's judgment as to the ineffective-assistance claim and vacated its judgment as to the cumulative-error claim, with instructions to the district court to conduct an evidentiary hearing on remand. *See* 704 F.3d at 822. Following an evidentiary hearing, the district court again denied Mr. Littlejohn's petition, *see Littlejohn v. Trammell*, No. CIV-05-225-M, 2014 WL 3743931 (W.D. Okla. July 30, 2014) (unpublished), and he filed this appeal.

## II

We begin with Mr. Littlejohn's ineffective-assistance claim. To make out an ineffective-assistance claim, a petitioner "must show both that his counsel's performance 'fell below an objective standard of reasonableness' *and* that 'the deficient performance prejudiced the defense.'" *Byrd v. Workman*, 645 F.3d 1159, 1167 (10th Cir. 2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). These two prongs may be addressed in any order; indeed, in *Strickland*, the Supreme Court emphasized that "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." 466 U.S. at 697; *accord Byrd*, 645 F.3d at 1167; *Knighton v. Mullin*, 293 F.3d 1165, 1178 (10th Cir. 2002). Here, we take this approach and conclude that, even assuming *arguendo* that Mr. Rowan's performance was constitutionally deficient, Mr. Littlejohn's ineffective-assistance claim fails on the basis of lack of prejudice.

Under the prejudice prong, a petitioner must demonstrate "a reasonable

5

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "When a petitioner alleges ineffective assistance of counsel stemming from a failure to investigate mitigating evidence at a capital-sentencing proceeding, 'we evaluate the totality of the evidence—both that adduced at trial, and the evidence adduced in habeas proceedings.'" *Williams v. Trammell*, 782 F.3d 1184, 1215 (10th Cir. 2015) (quoting *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004)), *cert. denied*, --- U.S. ----, 136 S. Ct. 806 (2016).

In doing so, we "reweigh the evidence in aggravation against the totality of available mitigating evidence," *Hooks v. Workman*, 689 F.3d 1148, 1202 (10th Cir. 2012) (quoting *Young v. Sirmons*, 551 F.3d 942, 960 (10th Cir. 2008)), considering "the strength of the State's case and the number of aggravating factors the jury found to exist, as well as the mitigating evidence the defense did offer and any additional mitigating evidence it could have offered," *Knighton*, 293 F.3d at 1178. "[W]e must consider not just the mitigation evidence that Defendant claims was wrongfully omitted, but also what the prosecution's response to that evidence would have been." *[Michael] Wilson v. Trammell*, 706 F.3d 1286, 1306 (10th Cir. 2013); *accord Grant v. Trammell*, 727 F.3d 1006, 1022 (10th Cir. 2013). At the end of the day, "[i]f 'there is a reasonable probability that at least one juror would have struck a different balance'—*viz.*, that 'at least one juror would have refused to impose the death

penalty'—prejudice is shown." *Hooks*, 689 F.3d at 1202 (citations omitted) (first quoting *Wiggins v. Smith*, 539 U.S. 510, 537 (2003); then quoting *Wilson v. Sirmons*, 536 F.3d 1064, 1124 (10th Cir. 2008) (Hartz, J., concurring)).

Under the foregoing rubric, we begin by discussing the salient aspects of the procedural history and factual background of Mr. Littlejohn's ineffective-assistance claim. We then turn to whether the more comprehensive factual record now before us lends force to Mr. Littlejohn's claim of prejudice under *Strickland*.

### A

In his habeas petition, Mr. Littlejohn asserted that his trial counsel, Mr. Rowan, rendered ineffective assistance in the resentencing proceeding by failing to adequately investigate and present a mitigation theory of organic brain damage. Rather, Mr. Rowan focused his mitigation case on the testimony of Dr. Wanda Draper, a developmental epistemologist who presented a socio-psychological account of the impact that Mr. Littlejohn's troubled upbringing had on his development. More specifically, Dr. Draper testified extensively about the substance abuse of Mr. Littlejohn's mother during her pregnancy and regarding the lack of nurturing and attention that Mr. Littlejohn received as a child, and then explained the stunted development that Mr. Littlejohn suffered as a result of these factors. In particular, she testified that Mr. Littlejohn had long exhibited emotional problems and disruptive behavior, and determined that, although he understood the difference between right and wrong, he often did not act on that

7

knowledge.  More specifically, on cross-examination, Dr. Draper stated that she did not think that Mr. Littlejohn had "a mental illness per se"; rather, "he had emotional disturbance, [and] he was a troubled child."  State R., Vol. VI, Resentencing Tr. at 133.

In his habeas petition, Mr. Littlejohn advanced the view that Mr. Rowan should have investigated and presented evidence of organic brain damage that he suffered as a result of his mother's drug use during her pregnancy with him.  In order to buttress that assertion, Mr. Littlejohn attached a declaration from Dr. Saint Martin, a psychiatrist who examined him in 2005, five years after his resentencing.  In the declaration, Dr. Saint Martin stated that "Mr. Littlejohn's history and behavioral symptomatology presented indications of neuro-developmental deficits."  R., Vol. I, at 176.  In other words, Mr. Littlejohn's brain was "not 'wired' correctly" at the "level of the synapse[—i.e.,] the microscopic connections between individual brain cells."  *Id.* at 177.  Dr. Saint Martin specifically explained that Mr. Littlejohn "suffer[ed] [from] a behavioral disorder manifested by poor impulse control, psychological immaturity and judgment [and] caused by neurodevelopmental deficits experienced in his peri-natal development."  *Id.*  Finally, Dr. Saint Martin described these deficits as "irreparable, but . . . treatable" because "drug therapy" can "control the behavior and diminish the impulsivity, which creates most of the problems in interacting with society."  *Id.* at 178–79.  Based on Dr. Saint Martin's declaration, Mr.

8

Littlejohn argued that Mr. Rowan acted ineffectively by failing to investigate and present evidence of Mr. Littlejohn's organic brain damage during his resentencing.

In its initial consideration of Mr. Littlejohn's habeas petition, the district court denied relief on the ineffective-assistance claim. *See Littlejohn*, 2010 WL 2218230, at *26–*30. The district court first found de novo review of Mr. Littlejohn's claim appropriate, because the state court had not adjudicated the claim on its merits, and because the State did not argue that Mr. Littlejohn procedurally defaulted his claim. *See id.* at *27. Reviewing the claim de novo, the district court found that Mr. Littlejohn had failed to demonstrate any prejudice flowing from Mr. Rowan's allegedly deficient performance, because Dr. Draper had provided the jury with a complete picture of Mr. Littlejohn's troubled personal development. *See id.* at *28–*30. The district court thus concluded that the evidence that Dr. Saint Martin could have presented "would not have had a pervasive effect on the jury's decision"; as a result, it found "no reasonable probability that the balancing of the aggravating and mitigating evidence would have led the jury to return a sentence other than death." *Id.* at *30.

In *Littlejohn I*, we reversed the district court's judgment on this claim. At the outset, we detailed two unique procedural features of Mr. Littlejohn's ineffective-assistance claim. First, we emphasized that the absence of a state-court "merits adjudication" or a "procedural default" on the ineffective-assistance

9

claim triggered a merits-based de novo review. 704 F.3d at 855. Second, we determined that Mr. Littlejohn's essentially unchallenged diligence in developing the factual basis for his ineffective-assistance claim relieved him of the obligation of satisfying the "strict standards for an evidentiary hearing" under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Id*. at 858.

Undertaking our own de novo review, we concluded—based on the averments in Dr. Saint Martin's declaration—that Mr. Littlejohn's ineffective-assistance claim "*may* have merit." *Id.* at 856 (emphasis added). We noted that "[e]vidence that an organic brain disorder was a substantial factor in engendering Mr. Littlejohn's life of deviance probably would have been a significant favorable input for Mr. Littlejohn in the jury's decisionmaking calculus." *Id.* at 864. Evidence of organic brain damage, we explained, could have strengthened Mr. Littlejohn's mitigation case by offering "at least a partial explanation" for his extensive criminal history—and importantly, one grounded in his physical, neurological deficits. *Id.*

In addition, the evidence of organic brain damage could have weakened the prosecution's case in support of the continuing-threat aggravator, by "offer[ing] a less blameworthy explanation of Mr. Littlejohn's extensive criminal history" and by providing some suggestion that Mr. Littlejohn suffered from *treatable* deficits. *Id.* at 865. Along these lines, we emphasized that evidence of organic mental deficits "ranks among the most powerful types of mitigation evidence available"

10

and stressed that such evidence is qualitatively different—in significant ways—from the social-environment evidence that we typically are called on to consider in capital habeas cases. *Id*. at 864.

Based on the current record, we concluded as to the prejudice showing that Dr. Saint Martin's declaration created "a reasonable probability that [the presentation of] such evidence would have led at least one juror to support a sentence less than death." *Id.* In other words, we determined—under the limited circumstances developed at that time—that "[e]vidence that an organic brain disorder was a substantial factor in engendering Mr. Littlejohn's life of deviance probably would have been a significant favorable input for Mr. Littlejohn in the jury's decisonmaking calculus," and that Mr. Rowan's failure to investigate and present organic-brain-damage evidence (as sketched by Dr. Saint Martin) would have caused Mr. Littlejohn prejudice. *Id.*; *see id*. at 865–67.

However, we also underscored that further factual development would be necessary before a definitive conclusion could be reached regarding the merits of Mr. Littlejohn's ineffective-assistance claim. *Id.* at 856. Indeed, we emphasized the "highly fact-bound" nature of Mr. Littlejohn's *particular* ineffective-assistance claim, and thus explained that "[a] further exploration of the substance of Dr. Saint Martin's findings might well reveal significant theoretical or factual holes that would make a finding of deficient performance or prejudice unsound." *Id*.

11

Consistent with our reticence to reach definitive determinations on the undeveloped record, we said:

> [W]e conclude that Mr. Littlejohn has alleged a mitigation theory and supporting facts which, *if true*, would entitle him to relief under *Strickland*—*viz.*, would justify us in concluding that his counsel was constitutionally deficient in failing to investigate and put on mitigating evidence concerning Mr. Littlejohn's claimed physical brain injury and that, but for that failure, there is a reasonable probability that the jury would have selected a penalty less than death.

*Id.* at 867. In light of these conclusions, we remanded the matter to the district court for further factual findings concerning Mr. Littlejohn's mitigation theory.

In particular, on remand, we tasked the district court with determining whether Mr. Littlejohn could demonstrate sufficient factual support for his mitigation theory. The district court held an evidentiary hearing at which both parties presented evidence and testimony. As most relevant here, Dr. Saint Martin offered—in terms far more specific than in his declaration, which we considered in *Littlejohn I*—diagnoses of Mr. Littlejohn's physiological mental deficits. Dr. Saint Martin explained that he "diagnosed an impulse control disorder[] and attention deficit disorder[,]"[1] R., Vol. III, at 123—both of which

---

[1]    For clarity's sake, we note that conditions falling under the general classification of "attention deficit disorder," which is commonly abbreviated as "ADD," also may be referred to in the caselaw and secondary literature as "attention-deficit/hyperactivity disorder," which typically is abbreviated as "ADHD." The latter name is of more recent vintage and is "the preferred official name" for the condition, though "many authors, speakers, and clinicians still use 'ADD' to describe the disorder." Stephen P. Hinshaw & Katherine Ellison,

12

constitute "dysfunctions in Mr. Littlejohn's frontal lobes," stemming from

"prenatal and perinatal insults." *Id.* at 126.[2]

---

ADHD: WHAT EVERYONE NEEDS TO KNOW 12 (2016); *see also* Mark Selikowitz, THE FACTS: ADHD 14 (2d ed. 2009) (ebook) (describing the shift from ADD to ADHD and noting "a number of name changes attest to the rapid evolution in our understanding of this condition"). "The essential function of Attention-Deficit/Hyperactivity Disorder is a persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequently displayed and more severe than is typically observed in individuals at a comparable level of development . . . ." Am. Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 85 (4th ed., text revision 2000) [hereinafter DSM]; *see also Attention-deficit/hyperactivity disorder (ADHD)*, ENCYCLOPEDIA BRITANNICA (database updated Sept. 15, 2017) (describing "[a]ttention-deficit/hyperactivity disorder (ADHD)" as "a behavioral syndrome characterized by inattention and distractibility, restlessness, inability to sit still, and difficulty concentrating on one thing for any period of time"). In some forms of ADHD, impulsivity is a significant feature. *See, e.g.*, Selikowitz, *supra*, at 5 ("While some children with the hyperactive-impulsive form of ADHD will have hyperactivity and impulsivity, some will have only hyperactivity, while others will have only impulsivity."); DSM, *supra*, at 87 ("Although many individuals present with symptoms of both inattention and hyperactivity-impulsivity, there are individuals in whom one or the other pattern is predominant."). However, Dr. Saint Martin testified that he intended for his impulse-control diagnosis to relate to a separate disorder—apart from, and in addition to, attention deficit disorder—which the DSM seemingly contemplates. *See* R., Vol. III, at 131 (testifying, "in the DSM . . . not every impulse control disorder can be categorized with specificity, so you have these non-specific types of impulse control disorders and that's what I [i.e., Dr. Saint Martin] diagnosed"). Specifically, for these "disorders of impulse control that are not classified" elsewhere, the DSM provides the following: "The essential feature of Impulse-Control Disorders is the failure to resist an impulse, drive, or temptation to perform an act that is harmful to the person or to others." DSM, *supra*, at 663; *see also United States v. McBroom*, 124 F.3d 533, 549 n.16 (3d Cir. 1997) (discussing a diagnosis of this type of impulse control disorder).

[2]     Because Dr. Saint Martin relied on the DSM in formulating his diagnoses regarding Mr. Littlejohn, a few words regarding that publication will contextualize his conclusions. First, though a fifth edition of the DSM was issued in 2013, Dr. Saint Martin did not rely on that edition in testifying in the evidentiary hearing in 2014, nor was it available for him to use in evaluating Mr.

13

These two disorders, in Dr. Saint Martin's opinion, led Mr. Littlejohn to have "low frustration tolerance" and "a lot of problems with impulses" because "the normal controls one would expect [to] override destructive impulses are not present or present enough." *Id.* at 126–27. When asked about possible treatment options for these disorders, Dr. Saint Martin noted "an 80 percent response rate to medication" for attention deficit disorder and a response "on the order of about 40 percent" for an impulse-control disorder, but admitted that Mr. Littlejohn had never received medications for these disorders and that, consequently, there was no guarantee that he would respond to them. *Id.* at 128–29, 186.

In addition, Dr. Saint Martin acknowledged on cross-examination that, "on a very, very, very large number of tests of intellectual functioning and neuropsychological functioning, Mr. Littlejohn perform[ed] in the low-average to average-range." *Id.* at 146–47. Additionally, he diagnosed Mr. Littlejohn with

Littlejohn in 2005. Dr. Saint Martin had a "problem" with relying on the fifth edition in his testimony because "it ha[d] been out in the world for less than a year and we are really talking about conditions that were diagnosed prior to the time that text came out." R., Vol. III, at 163. Instead, Dr. Saint Martin appears to have relied on the edition of the DSM immediately prior to the fifth in examining Mr. Littlejohn—*viz.*, the fourth edition, text revision ("DSM-IV-TR"), which was published in July 2000. *See id.* at 178 (responding to a cross-examination question regarding how "another expert" could check his findings, Dr. Saint Martin said they could "look in . . . at the time it would have been DSM-IV-TR"). This edition updated the DSM's fourth edition, which was published in 1994. Because Dr. Saint Martin relied on the fourth edition, text revision, so do we. We note, moreover, that this edition would have been available at the time of Mr. Littlejohn's October–November 2000 resentencing.

14

"mixed personality traits," but declined to conclude that he suffers from anti-social personality disorder. *Id.* at 123. Nevertheless, Dr. Saint Martin acknowledged that Mr. Littlejohn exhibited a number of characteristics "consistent with anti-social personality disorder" and admitted that "individuals with attention deficit hyperactivity disorder are significantly more likely to develop anti-social personality disorder." *Id.* at 177.

In *Littlejohn I*, we asked the district court to reevaluate in an evidentiary hearing Mr. Littlejohn's ineffective-assistance claim, notably on the issue of prejudice. More specifically, this examination should have entailed the district court making a critical determination in the first instance of whether Mr. Littlejohn did in fact suffer from treatable mental deficits that could have substantially explained his past criminal behavior, such that it was reasonably probable that Mr. Rowan's failure to investigate and present evidence of organic brain damage caused Mr. Littlejohn prejudice. However, the district court's findings are not specific regarding these matters. Instead, the court generally reasoned that Dr. Saint Martin's declaration was "not all that it appeared to be," and found that "the introduction of this evidence would have been accompanied by demonstrated limitations and pitfalls." R., Vol. I, at 961. Essentially, under this rationale, the district court concluded that Mr. Littlejohn had failed to demonstrate prejudice, and this appeal followed.

\*\*\*

15

Our analysis begins with a discussion of the relevant standard of review. We then turn to whether the evidence elicited on remand demonstrates that organic brain damage played a substantial role in engendering Mr. Littlejohn's life of criminal deviance—*viz.*, the critical question we identified in *Littlejohn I*. Although we cannot fully embrace the district court's analysis, we ultimately agree with the court's determination that Mr. Littlejohn has not demonstrated prejudice under *Strickland*.

**B**

On appeal, Mr. Littlejohn argues that the district court erred in finding that he failed to demonstrate prejudice stemming from Mr. Rowan's failure to investigate and present evidence of organic brain damage. Based on the unique procedural circumstances of this case explicated above, the district court appropriately reviewed Mr. Littlejohn's ineffective-assistance claim de novo. *See Littlejohn I*, 704 F.3d at 855–56 (finding de novo review appropriate, because the state courts never adjudicated the ineffective-assistance claim on the merits); *id.* at 867 n.26 ("We pause to underscore the unique procedural posture of this case. We are not obliged here to defer to a state-court adjudication of the ineffective-assistance claim.").

In this procedural setting, "we review the district court's legal conclusions de novo and factual findings for clear error." *Allen v. Mullin*, 368 F.3d 1220, 1234 (10th Cir. 2004); *see also Romano v. Gibson*, 239 F.3d 1156, 1164 (10th

16

Cir. 2001) ("Where the state court did not address the merits of a habeas claim, this court reviews the district court's resolution of that ground for relief *de novo*, reviewing for clear error any district court findings of fact."). Because "[c]laims of ineffective assistance of counsel raise mixed questions of law and fact," in reviewing the district court's decision here, we apply "de novo [review], granting due deference to the factual findings underlying the district court's determination." *Miller v. Champion*, 262 F.3d 1066, 1071 (10th Cir. 2001); *accord Boltz v. Mullin*, 415 F.3d 1215, 1221–22 (10th Cir. 2005). Moreover, "we may affirm [the district court] on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011).

As noted, the district court made no precise findings on the key question of whether organic brain damage played a substantial role in engendering Mr. Littlejohn's life of criminal deviance. The district court did, however, impliedly conclude that any evidence of brain damage that Mr. Rowan could have presented to the jury would have done little to explain Mr. Littlejohn's criminal history, given the court's explanation that Dr. Saint Martin's declaration was "not" Mr. Littlejohn's "holy grail," nor "all that it appeared to be." R., Vol. I, at 961. Indeed, the district court explained that "the introduction of this evidence would have been accompanied by a number of "demonstrated limitations and pitfalls[,]"

17

including evidence suggesting that Mr. Littlejohn suffered from antisocial personality disorder.[3] *Id.*

With the stage thus set, we first address the central issue of whether evidence of Mr. Littlejohn's alleged organic brain damage could have substantially explained his criminal past, and ultimately conclude that the actual evidence—in contrast to the *general* averments of Dr. Saint Martin's declaration—would have offered a sentencing jury little, if anything, meaningful in this regard. Moreover, like the district court, we conclude that the weak mitigating effect of the brain-damage evidence would have been significantly diminished by the evidence the prosecution almost inevitably would have

------

[3] Ultimately, the question of whether Mr. Littlejohn's organic-brain-damage evidence could have substantially explained his life of criminal deviance is a mixed question of law and fact with a significant legal component, which we ordinarily review de novo. *See, e.g.*, *Supre v. Ricketts*, 792 F.2d 958, 961 (10th Cir. 1986) ("Where [a] mixed question [of law and fact] involves primarily a factual inquiry, the clearly erroneous standard is appropriate. If, however, the mixed question primarily involves the consideration of legal principles, then a *de novo* review by the appellate court is appropriate."); *see also Allison v. Bank One-Denver*, 289 F.3d 1223, 1235 n.2 (10th Cir. 2002), *as amended on denial of reh'g* (June 19, 2002) ("The district court concluded that the parties intended to convert to participant direction . . . , but then relied on case law to determine that the collection of documents, together with that intent, constituted an amendment. The issue is more akin to a mixed question of law and fact in which the legal issues predominate."). We are fully able to resolve this mixed question with the aid of the district court's factual findings, though we must imply them to some extent. *Cf. United States v. Powell*, 973 F.2d 885, 889 (10th Cir. 1992) ("[S]pecific findings of fact by the district court will always be helpful. Their existence is not a necessity, however . . . . Since the appellate court may imply essential findings, the district court does not have to provide them, even in complicated cases." (citations and footnote omitted)).

introduced in rebuttal. As a result, we determine that Mr. Littlejohn has failed to meet his burden of demonstrating prejudice under *Strickland*.

**1**

On the first question of whether the evidence demonstrates that organic brain damage operated as a "substantial factor" engendering Mr. Littlejohn's life of criminal deviance, we conclude that it did not. *Littlejohn I*, 704 F.3d at 864. In reaching this conclusion, we exercise our discretion to expand on the district court's limited discussion and reasoning.

Focusing on the specific diagnoses that Dr. Saint Martin proffered at the evidentiary hearing—that is, attention deficit disorder and an impulse-control disorder—we conclude that under the circumstances of this case, these two commonly diagnosed conditions are too weak to support an argument for prejudice under *Strickland*. In other words, although Dr. Saint Martin's declaration in *Littlejohn I* presented the legally-cognizable possibility that evidence of organic brain damage would go far in explaining Mr. Littlejohn's criminal background—thereby significantly contributing to a showing of *Strickland* prejudice—his more detailed testimony on remand largely negates that possibility. This is particularly true when his testimony is evaluated in the context of other evidence that was—or could have been—offered to the resentencing jury.

To frame our analysis, we begin with the general proposition that we

19

underscored in *Littlejohn I*: "Evidence of organic mental deficits ranks among the most powerful types of mitigation evidence available." 704 F.3d at 864. But this proposition only has explanatory power with respect to our caselaw when appropriately qualified in two salient respects. *First*, it does not mean that *all* evidence of organic brain damage has the same potency in the *Strickland* prejudice analysis and will ineluctably result in a determination of prejudice. Our caselaw requires us to examine the *precise nature* of the alleged organic brain damage. In this regard, in several instances, we have concluded that evidence alleged to show organic brain damage, or related mental-health evidence, would have had little, if any, impact on the jury's decision-making process. *See id.* at 866 ("[W]e have previously found a lack of prejudice in some cases where counsel failed to present additional mental-health evidence in a capital sentencing proceeding.").[4]

For example, in *Smith v. Gibson*, 197 F.3d 454 (10th Cir. 1999), the

---

[4]    In *Littlejohn I*, we determined that some of these cases were "distinguishable" and that they could not undermine our conclusion that, *if true*, the mitigation theory and facts that Dr. Saint Martin averred in his declaration could establish prejudice under *Strickland*. 704 F.3d at 867. However, for reasons explicated *infra*, we conclude that the truth that Dr. Saint Martin alluded to in his declaration—when subjected to the crucible of adversarial testing—proved to be illusory. And our distinguishing analysis in *Littlejohn I*—which focused, *inter alia*, on the fact that "the aggravating evidence was more serious" in those cases than here, *id.*—is not at odds with the larger legal message that the lion's share of these cases delivers: *viz.*, *Strickland* prejudice does not necessarily follow from the failure to investigate and present evidence of organic brain damage.

20

petitioner argued that his counsel provided constitutionally-deficient performance, because he failed to request the assistance of a mental-health expert to elucidate the notion that he "suffer[ed] from organic brain damage [that] impair[ed] his judgment and cause[d] him to act impulsively." *Id*. at 463. Nevertheless, "in light of the strength of the evidence supporting the aggravating circumstances," and "the limited mitigating effect of [his] psychiatric evidence," we concluded that the failure to present additional evidence caused no prejudice. *Id*.; *see also [Lois] Smith v. Massey*, 235 F.3d 1259, 1282 (10th Cir. 2000) ("Although the evidence pertaining to Smith's organic brain damage would have been proper mitigating evidence and may have helped explain the crime to some degree, . . . we are not persuaded it is reasonably probable that the introduction of the organic brain damage evidence would have led the jury to choose a life sentence rather than a death sentence."), *abrogated on other grounds by Neill v. Gibson*, 278 F.3d 1044 (10th Cir. 2001); *cf. Motley v. Collins*, 18 F.3d 1223, 1228 (5th Cir. 1994) (declining to find prejudice where "the evidence of organic brain damage was relatively weak").

*Second*, we have concluded, in some instances, that organic-brain-damage evidence would have been just as likely—if not more likely—to have had an aggravating effect rather than a mitigating effect on a sentencing jury. *See Davis v. Exec. Dir. of Dep't of Corr.*, 100 F.3d 750, 762 (10th Cir. 1996) (explaining that courts must carefully review omitted mitigation evidence to determine if it

21

truly mitigates or, instead, has the possibility of being a "two-edged sword" (quoting *Davis v. People*, 871 P.2d 769, 774 (Colo. 1994))).

In *Gilson v. Sirmons*, 520 F.3d 1196 (10th Cir. 2008), for example, the petitioner "sustained a serious brain injury" during an automobile accident, and "experienced negative physical and mental effects since the accident (e.g., a constant 'global' headache; photophobia; [and] increased sensitivity to auditory stimuli)." *Id*. at 1249. Nevertheless, we emphasized that the evidence that the petitioner claimed should have been introduced—a neuropsychological consulting report—"paint[ed] a bleak and ominous picture of [his] personality, behavior, and likely future conduct" by suggesting, among other things, that he had a "tendency to become agitated and belligerent easily when frustrated." *Id*. "Given these extremely negative descriptions of [the petitioner's] likely behavior, we conclude[d] that the presentation of [the organic-brain-damage evidence] to the jury during the second-stage proceedings would not have resulted in a different outcome." *Id*. at 1249–50. To the contrary, we determined that the evidence "would likely have weighed *against* [the petitioner] by erasing any lingering doubts that may have existed as to his role in [the underlying] murder, and by confirming the jury's conclusion that he represented a continuing threat, even if confined in prison for life." *Id*. at 1250 (emphasis added).

Analogously, in *Cannon v. Gibson*, 259 F.3d 1253 (10th Cir. 2001), the petitioner asserted that his trial counsel should have introduced

22

neuropsychological evidence and social-history background that could have "explained to the jury how [the petitioner] came to participate in th[e] crime and why they should [have] spare[d] his life." *Id.* at 1277. Our review of the omitted evidence, however, led us to deem the evidence "far less beneficial than asserted" by the petitioner. *Id.* More specifically, we determined that the omitted "mitigating" evidence tended to depict petitioner as "an unstable individual with very little impulse control." *Id.* at 1278. As a result, we concluded that the "evidence would have negated much of the mitigation evidence actually adduced by trial counsel and could have strengthened the prosecution's argument that [the petitioner] represented a continuing threat to society." *Id.* Given those circumstances, we concluded that the petitioner failed to demonstrate prejudice under *Strickland*. *Id.*

**a**

Turning to the facts of this case, although Dr. Saint Martin couched his initial declaration under the broad rubric of organic brain damage, his findings—which the parties teased out in the hearing—ultimately centered on two diagnoses: attention deficit disorder and an impulse-control disorder. Attention deficit disorder is a commonly diagnosed condition. *See, e.g.*, Stephen P. Hinshaw & Katherine Ellison, ADHD: WHAT EVERYONE NEEDS TO KNOW 24 (2016) ("Today, approximately 11 percent of all US youth aged 4-17 have at some point received an ADHD diagnosis . . . . The estimates are less authoritative after

23

age 17, but researchers believe that there may be around 10 million adults with the disorder in the United States."); Mark Selikowitz, THE FACTS: ADHD 2 (2d ed. 2009) (ebook) (noting that the condition is "one of the most common conditions in childhood, affecting as many as 5% of school-aged children"); Dorothy Nelkin & Laurence Tancredi, *Classify and Control: Genetic Information in the Schools*, 17 AM. J.L. & MED. 51, 56 (1991) (describing "attention deficit disorder" as "the most common behavior problem of school-aged children" (citation omitted)); *Attention-deficit/hyperactivity disorder (ADHD)*, ENCYCLOPEDIA BRITANNICA (database updated Sept. 15, 2017) (noting that ADHD "is the most commonly diagnosed childhood psychiatric disorder" in the U.S.). Moreover, Dr. Saint Martin notably testified at the evidentiary hearing that attention deficit disorder has "a very, very low correlation with criminal activity," R., Vol. III, at 323—an admission that casts direct doubt on Mr. Littlejohn's claim that the evidence would have offered an explanation for Mr. Littlejohn's long history of criminal conduct.

In this regard, a number of cases from our court and our sister circuits have specifically concluded that evidence of attention deficit disorder does not favor a finding of prejudice. For example, in *Wackerly v. Workman*, 580 F.3d 1171 (10th Cir. 2009), the petitioner presented evidence that he may have suffered from an attention deficit disorder; we held, however, that the evidence failed to create "a reasonable probability that it would have moved any juror to change his or her

sentencing calculus[,]" because the diagnosis did "not give context to the murder, provide an explanation for Mr. Wackerly's behavior, or suggest Mr. Wackerly bears any less moral culpability for his actions." *Id.* at 1182.

And our sister circuits have reached similar conclusions. *See, e.g.*, *Brown v. Ornoski*, 503 F.3d 1006, 1016 (9th Cir. 2007) (noting that attention deficit disorder is a "somewhat common disorder[]" and concluding that "although [an attention deficit disorder diagnosis would] add quantity to the mitigation case, [it] add[s] little in terms of quality"); *Campbell v. Polk*, 447 F.3d 270, 284 (4th Cir. 2006) (concluding that evidence that petitioner had attention deficit disorder "would not have added in any meaningful way to . . . mitigation evidence [that was introduced]"); *see also Gallegos v. Schriro*, 583 F. Supp. 2d 1041, 1076–77 (D. Ariz. 2008) ("Petitioner cannot establish that he was prejudiced by counsel's performance. . . . [E]vidence . . . that Petitioner suffered from ADHD . . . would not have altered the basic sentencing profile provided to the judge."), *aff'd sub. nom. Gallegos v. Ryan*, 820 F.3d 1013 (9th Cir. 2016), *amended on reh'g*, 842 F.3d 1123 (9th Cir. 2016). In other words, these cases emphasize that a diagnosis of attention deficit disorder at least frequently offers little, if any, *quality* mitigating evidence, and Mr. Littlejohn's diagnosis presents no basis for us to depart from the reasoning of these cases.

Regarding Mr. Littlejohn's impulse-control diagnosis, this, too, would appear to be a rather garden-variety condition—at least in the "non-specific" form

25

(*supra* note 1) that Dr. Saint Martin diagnosed.  R., Vol. III, at 131; *see United States v. Miller*, 146 F.3d 1281, 1285 (11th Cir. 1998) ("Nor would poor impulse control be unusual, regardless of whether it stemmed from an impulse control disorder . . . .  Many offenders commit crimes because they have poor impulse control.  An impulse control disorder is not so atypical or unusual that it separates this defendant from other defendants." (footnote omitted)); *cf.* DSM, *supra*, at 677 (noting the category of impulse-control disorders—"Not Otherwise Specified"—which is for, *inter alia*, "disorders of impulse control (e.g., skin picking) that do not meet the criteria for any specific Impulse-Control Disorder").

In any event, courts have expressed skepticism about placing significant weight in the *Strickland* prejudice analysis on such a condition.  This is particularly so given that such evidence tends to depict the petitioner as unstable and unable to control his actions; consequently, it could have an overall aggravating, rather than mitigating, effect.  In *Gilson*, for example, a doctor who examined the petitioner after his sentencing found that he "would have difficulty conforming his behavior to societal norms due to impulsivity, poor judgment, and the failure to see or understand the consequences of his actions" and concluded, as a result, that the petitioner "had an inability to regulate behavior or inhibit impulses."  520 F.3d at 1249–50.  "Given these extremely negative descriptions of [the petitioner's] likely behavior," we concluded that the presentation of the impulse-control evidence "would not have resulted in a different outcome."  *Id.* at

26

1250; *see also Cannon*, 259 F.3d at 1278 (declining to find prejudice where "the omitted evidence tend[ed] to depict [the petitioner] as an unstable individual with very little impulse control").

Our sister circuits have, in turn, reached similar conclusions. *See, e.g.*, *Fautenberry v. Mitchell*, 515 F.3d 614, 627 (6th Cir. 2008) (finding it "highly unlikely" that evidence of brain damage resulting in "serious problems in such areas of day-to-day functioning as impulse control" would have changed petitioner's sentence); *Brown*, 503 F.3d at 1016 (holding that evidence of "impulse control problems" did not warrant finding of prejudice); *Mills v. Singletary*, 161 F.3d 1273, 1286 (11th Cir. 1998) (stating "Mills has also failed to demonstrate prejudice," in referencing the Florida Supreme Court's finding that the petitioner's "mental problems boiled down to being impulsive"); *see also Rodriguez v. Quarterman*, 204 F. App'x 489, 498 (5th Cir. 2006) (unpublished) (discerning no reasonable probability that evidence concerning "the link between the damage to [the petitioner's] brain's frontal lobes and his impulsive nature" would have changed petitioner's sentence).

In other words, our authority and that of our sister circuits suggest that an impulse-control diagnosis typically tends to offer little, if any, *quality* mitigating evidence and, actually, may come with a sharp aggravating-evidence component. And, again, the nature of Mr. Littlejohn's diagnosis offers us no reason to part from this premise.

27

**b**

The cases that Mr. Littlejohn identifies do not compel a different conclusion. In his briefing, Mr. Littlejohn points to *Williams v. Taylor*, 529 U.S. 362 (2002), in which the Supreme Court concluded that the petitioner had demonstrated prejudice based, in part, on evidence that he "might have mental impairments organic in origin." *Id.* at 370. Nevertheless, Mr. Littlejohn relies on that conclusion in a vacuum; a closer inspection of *Williams* reveals that the Court's prejudice determination rested on a wide gamut of meaningful mitigating evidence, not just the evidence of organic mental impairments. Along these lines, the Court explained that the omitted evidence included (1) documents that "dramatically described mistreatment, abuse, and neglect during . . . childhood," (2) "testimony that [the petitioner] was 'borderline mentally retarded,'" (3) testimony that he had suffered "repeated head injuries[] and might have mental impairments organic in origin," and (4) testimony that, despite these issues, the petitioner would pose no "future danger to society" if kept in a "structured environment." *Id.* at 370–71. In finding prejudice in counsel's failure to conduct a sufficient investigation into this evidence, the Court emphasized "the comparatively voluminous" nature of the information *and* the fact that it spoke directly in the petitioner's favor. *Id.* at 398. In other words, the Court found *Strickland* prejudice because the petitioner presented a weighty load of *meaningful*—yet omitted—mitigating evidence. *See id.* Mr. Littlejohn has, by

28

contrast, made no similarly forceful and multifaceted showing.[5]

Moreover, the Tenth Circuit cases that Mr. Littlejohn cites do not militate in favor of a prejudice determination here. First, in finding prejudice in *Smith v. Mullin*, we described counsel's "halfhearted mitigation case," 379 F.3d at 944 (quoting *Wiggins*, 539 U.S. at 526), as "pitifully incomplete, and in some respects, border[ing] on the absurd." *Id.* Indeed, the *Smith* jury "never received an explanation for [the petitioner's] behavior," and counsel then "negated whatever value [the actually presented] mental health evidence had," by essentially instructing "the jury not to consider it." *Id.* at 943–44. Similarly, in *Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007), we concluded that "counsel mounted an extraordinarily limited case in mitigation," because he presented evidence only that the petitioner "was a kind, hard-working, normal man." *Id.* at 1146. The omitted mitigating evidence, however, included that the petitioner "grew up in poverty, the twelfth child of a physically and emotionally abusive mother" and that he suffered from *serious* mental deficiencies. *Id.* at 1147.

The circumstances here fall far short of constituting the paradigmatic halfhearted mitigation case, as well illustrated in *Smith* and *Anderson*. In this

---

[5]     For example, unlike the petitioner in *Williams*, who was "borderline mentally retarded," 529 U.S. at 370, Dr. Saint Martin acknowledged that "on a very, very, very large number of tests of intellectual functioning and neuropsychological functioning, Mr. Littlejohn perform[ed] in the low-average to average-range." R., Vol. III, at 146–47.

29

regard, recall that Dr. Draper testified extensively on behalf of the defense about the substance abuse of Mr. Littlejohn's mother during her pregnancy and the lack of nurturing and attention that Mr. Littlejohn received as a child, and then explained the stunted development that Mr. Littlejohn suffered as a result. To be sure, the Supreme Court's "cases . . . emphasized the need for courts to consider the prejudicial effect of counsel's failure to investigate [and presumably present] a viable mitigation theory *even in the face* of an otherwise reasonable mitigation defense." *Littlejohn I*, 704 F.3d at 867. However, as demonstrated *supra*, the ostensibly "viable mitigation theory" omitted here was predicated on Dr. Saint Martin's declaration, and his testimony at the evidentiary hearing made clear that this theory was on the verge of life support: specifically, his testimony "reveal[ed] significant theoretical or factual holes that would make a finding of . . . prejudice unsound." *Id.* at 856.

In sum, although Dr. Saint Martin's initial declaration created a significant impression that Mr. Littlejohn may have been prejudiced by Mr. Rowan's alleged failure to investigate and present evidence of organic brain damage in the sentencing phase, the testimony he provided in the hearing on remand demonstrated that Mr. Littlejohn's organic-brain-damage diagnosis ultimately consisted of only two commonly diagnosed conditions: attention deficit disorder and an impulse-control disorder, neither of which was powerful enough on these facts to support a claim of prejudice. Put another way, the evidence presented at

30

the evidentiary hearing did not reveal that Mr. Littlejohn's alleged organic brain damage played a substantial role in engendering his life of criminal deviance; this conclusion strongly militates against a determination of *Strickland* prejudice.

**c**

But there is more bad news for Mr. Littlejohn. Aside from its inherent qualitative weaknesses, the introduction of Mr. Littlejohn's organic-brain-damage evidence at resentencing likely would have been the impetus for developments harmful to his case. In this regard, in analyzing *Strickland*'s prejudice prong, as previously noted, "we must consider not just the [omitted] mitigation evidence . . . but also what the prosecution's response to that evidence would have been." *[Michael] Wilson*, 706 F.3d at 1306. In this case, the presentation of Dr. Saint Martin's theory and related facts would have opened the door for the prosecution to introduce (1) harmful evidence that Mr. Littlejohn suffered from an antisocial personality disorder, (2) testimony concerning the limited treatment options available for Mr. Littlejohn's disorders, along with (3) damaging evidence regarding Mr. Littlejohn's post-offense misconduct.

Turning first to the evidence of antisocial personality disorder, in similar circumstances, we have characterized a petitioner's potential for continued dangerousness, even if incarcerated, as "perhaps [the] most important aggravating circumstance" that juries consider in weighing the death penalty. *Grant*, 727 F.3d at 1017. Mr. Littlejohn has, as the district court noted, been diagnosed with an

31

antisocial personality disorder, and although Dr. Saint Martin challenged the accuracy of this diagnosis, he acknowledged that Mr. Littlejohn displayed characteristics "consistent with anti-social personality disorder," and that individuals with attention deficit disorder have, in any event, a greater likelihood of developing an antisocial personality disorder.  R., Vol. III, at 176.

Importantly, courts have characterized antisocial personality disorder as the prosecution's "strongest possible evidence in rebuttal."  *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1327 (11th Cir. 2013) (quoting *Wong v. Belmontes*, 558 U.S. 15, 25 (2009)).  In other words, evidence of antisocial personality disorder tends to present an *aggravating*, rather than mitigating, circumstance in the sentencing context.  *See, e.g.*, *Stankewitz v. Wong*, 698 F.3d 1163, 1173 (9th Cir. 2012) ("We accept the state's argument that some of the evidence [the petitioner] has proffered illustrates serious antisocial behavior, including several emotional and violent outbursts throughout his life.  We also accept the state's argument that such evidence may be aggravating, rather than mitigating."); *Cummings v. Sec'y for Dep't of Corr.*, 588 F.3d 1331, 1368 (11th Cir. 2009) ("[The petitioner] is left mainly with a diagnosis of antisocial personality disorder, which is not mitigating but damaging."); *see also Correll v. Ryan*, 539 F.3d 938, 964 (9th Cir. 2008) (O'Scannlain, J., dissenting) ("In sum, the psychological evidence, if presented, would have demonstrated only that Correll has an antisocial personality with mild depression.  Such evidence has tremendous potential to be

32

more harmful than helpful."). Perhaps evidence suggestive of antisocial personality disorder would have otherwise been present in the case, as Mr. Littlejohn suggests. *See* Aplt.'s Opening Br. at 50 ("That Mr. Littlejohn had engaged in antisocial behavior was more than plain to all. That was not going to be shielded from the jurors."). But the introduction of evidence of organic brain damage of the kind that Dr. St. Martin testified about would have given the State ample ground to underscore and highlight this antisocial personality evidence before the jury and, more importantly, to frame it in terms of his (untreatable) physiological conditions and not just his bad behavior. And the foregoing cases give us reason to believe that such evidence would likely have some aggravating effect here.

Furthermore, the mitigating effect of Mr. Littlejohn's evidence of organic brain damage would likely have been diminished by the lack of reliable treatment options for Mr. Littlejohn's attention deficit and impulse-control disorders. As we explained in *Littlejohn I*, evidence of organic brain damage "*could have been* used [for its] powerful mitigating effect," *if* it demonstrated that Mr. Littlejohn's criminal past derived from a *treatable* physical condition, because his criminal past would no longer be "an accurate predictor of his future." 704 F.3d at 865 (emphasis added); *see also id.* at 865 n.24 (noting that "such testimony [as found in Dr. Saint Martin's declaration] would have offered a physiological explanation for Mr. Littlejohn's deviant conduct and some assurance that, through medical

33

treatments, his criminal, violent past would not be prologue"). In other words, the presence of a *treatable* condition "*could have* indicated to a jury that Mr. Littlejohn [posed no] continuing threat." *Id.* at 865 (emphasis added); *see also Hooks*, 689 F.3d at 1205 ("Diagnoses of specific mental illnesses . . . , which are associated with abnormalities of the brain and *can be treated with appropriate medication*, are likely to [be] regarded by a jury as more mitigating than generalized personality disorders . . . ." (alteration in original) (emphasis added) (quoting *Wilson*, 536 F.3d at 1094)).

However, Dr. Saint Martin's testimony likely would have left doubt in the minds of the jurors regarding whether Mr. Littlejohn had treatable organic-brain conditions. While he did explain that attention deficit disorder has "an 80 percent response rate to medication," he also had to acknowledge that an impulse-control disorder responds to medication only in "about 40 percent" of cases. R., Vol. III, at 128–29. Therefore, it was not certain that Mr. Littlejohn's two identified conditions were treatable; this was especially so as to the impulse-control disorder for which the rate of positive response was less than 50%. This uncertainty is further compounded by Dr. Saint Martin's admission that Mr. Littlejohn had *never* received treatment for the two conditions; thus, Dr. Saint Martin could not guarantee that Mr. Littlejohn would in fact respond favorably. In view of the relative lack of *reliable* treatment options, the potency (such that it is) of Dr. Saint Martin's organic-brain-damage evidence would likely have been

34

diminished.  Finally, the introduction of Dr. Saint Martin's theory would have invited—as the district court noted—the introduction of damaging evidence regarding Mr. Littlejohn's post-offense misconduct that likely would not have put him in a positive light with the jury.  More specifically, the prosecution could have (and likely would have) introduced evidence that Mr. Littlejohn lied to mental-health examiners—on at least two prior occasions—presumably, to secure a favorable evaluation.  In other words, the prosecution could have cast doubt on Dr. Saint Martin's diagnosis, as well as painted Mr. Littlejohn as a liar, based on Mr. Littlejohn's documented efforts to manipulate mental-health experts.

**3**

In sum, we conclude that Dr. Saint Martin's testimony offered far less than suggested in his initial declaration.  Indeed, although the initial declaration created the impression that Mr. Rowan omitted powerful mitigating evidence, the additional evidentiary development on remand demonstrated that Dr. Saint Martin's organic-brain-damage theory ultimately derived from two concrete diagnoses: attention deficit disorder and an impulse-control disorder.  As noted, courts routinely decline to attribute significant mitigating value to these commonly diagnosed conditions, and we believe that they would have been qualitatively weak in their mitigating effects on jurors, at least under the circumstances of this case.  Furthermore, any mitigating value derived from the introduction of this evidence here likely would have been significantly diminished

35

by the prosecution's expected response.

Given the shortcomings of Dr. Saint Martin's theory and evidence—revealed by his hearing testimony—we conclude that there is no reasonable probability that the omitted mitigating evidence of organic brain damage would have altered the resentencing outcome. In reaching this conclusion, we have considered both the totality of the evidence that was before the resentencing jury and the evidence that the prosecution likely would have presented in response to the omitted organic-brain-damage evidence. *See, e.g.*, *Hooks*, 689 F.3d at 1202 ("To assess prejudice arising out of counsel's errors at a capital-sentencing proceeding, we must 'reweigh the evidence in aggravation against the totality of available mitigating evidence.'" (quoting *Young*, 551 F.3d at 960)); *cf. id.* at 1200 (noting "[t]hat [*Strickland* prejudice] analysis is inherently fact-dependent and must take in the totality of evidence adduced at trial").

But Mr. Littlejohn urges us to keep in mind that "this was hardly a worst of the worst homicide case" and that a "[r]ealistic potential for a non-death choice existed." Aplt.'s Opening Br. at 47, 52. In the latter regard, he asserts that the "jurors' request for further instruction on the life without parole sentence indicates they may have been seriously considering the same." *Id.* at 52. However, we specifically rejected similar arguments in *Littlejohn I. See* 704 F.3d at 845 n.13. There, we said that "the prosecution presented a substantial amount

36

of aggravating evidence" and also refuted the misguided notion that the death penalty is only constitutionally and properly imposed in egregious homicide cases. *Id.*; *cf. Banks v. Workman*, 692 F.3d 1133, 1141 (10th Cir. 2012) ("[C]ase law has made clear that capital punishment for felony murder charges is both constitutional and not infrequently imposed when the defendant was present during the murder and acted with reckless disregard for human life."). Furthermore, we noted "our doubts about Mr. Littlejohn's conjectural inference about the jury's view of the purported closeness of the case" that he made based on its request for further instruction about life without parole. *Littlejohn I*, 704 F.3d at 845 n.13. We find Mr. Littlejohn's resurrected arguments no more persuasive here.

In sum, we conclude that Mr. Littlejohn was not prejudiced under *Strickland* by any ineffectiveness of his counsel in investigating and presenting organic-brain-damage evidence in his mitigation case. Consequently, we uphold the district court's denial of relief on Mr. Littlejohn's ineffective-assistance claim.

## III

Finally, we address Mr. Littlejohn's claim of cumulative error. On this issue, Mr. Littlejohn argues that even if we decline to grant relief on his ineffective-assistance claim, we should nonetheless reverse on the basis of cumulative error.

37

The cumulative-error analysis addresses the possibility that "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc); *see Hanson v. Sherrod*, 797 F.3d 810, 852 (10th Cir. 2015) ("A cumulative-error analysis merely aggregates all the errors that individually have [been] found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." (quoting *Workman v. Mullin*, 342 F.3d 1100, 1116 (10th Cir. 2003))).[6] "In the federal habeas context," we aggregate the "federal constitutional errors, and [our precedent emphasizes that] such errors will suffice to permit relief under [the] cumulative error doctrine only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness." *Littlejohn I*, 704 F.3d at 868 (quoting *Matthews v. Workman*, 577 F.3d 1175, 1195 n.10 (10th Cir. 2009)); *see Grant*, 727 F.3d at 1025 ("Only if the errors 'so fatally infected the trial that they violated the trial's fundamental fairness' is reversal appropriate." (quoting *Matthews*, 577 F.3d at

---

[6]    The State argues that "no authority from the United States Supreme Court recognizes 'cumulative error' as a separate violation of the federal constitution or as a separate ground for federal habeas relief." Aplee.'s Br. at 48–49.  In *Hanson*, however, we rejected that precise position.  *See* 797 F.3d at 852 n.16.

1195 n.10)).  It is not lost on us, however, that "as easy as the standard may be to state in principle, it admits of few easy answers in application."  *Grant*, 727 F.3d at 1025.  But "wherever the cumulative error line may fall, it is not crossed often."  *Id.*

Mr. Littlejohn argues that two errors *in addition to* Mr. Rowan's alleged ineffective assistance prejudicially impacted the jury's death-penalty determination at his resentencing: (1) "[t]he failure to provide adequate notice of the testimony of Bill Meers concerning an alleged admission and an alleged threat uttered by Mr. Littlejohn," Aplt.'s Opening Br. at 57; and (2) "Confrontation Clause violations concerning who fired the fatal shot," *id.*

As detailed in *Littlejohn I*, the first alleged error relates to testimony from Bill Meers, the victim's brother, that "Mr. Littlejohn told him that 'the motherfucker's [i.e., his brother's] dead and he ain't coming back'" and "I killed the motherfucker, I'll kill you."  704 F.3d at 832 (quoting State R., Vol. VI, Resentencing Tr. at 21 (Test. of Bill Meers)).  The prosecution failed to provide Mr. Littlejohn with notice of its intention to introduce these statements until the fifth day of the resentencing.  Despite the delinquent disclosure, the state court provided Mr. Littlejohn's counsel with "three days to prepare a response to Mr. Meers's statement . . . [and] in fact, he did prepare a reasonably cogent affirmative rebuttal case," *id.* at 836.

The second alleged error concerns the testimony of two witnesses from Mr.

39

Littlejohn's 1994 trial, both of whom testified that Mr. Littlejohn made a statement implicitly admitting that he (as opposed to Mr. Bethany) shot the victim. The state trial judge at the resentencing allowed the prosecution to read the testimony over Mr. Littlejohn's objection that the prosecution had not made a sufficient showing concerning the witnesses' unavailability.

In reviewing Mr. Littlejohn's case, the OCCA considered these claims of error, but *not* the ineffective-assistance claim that Mr. Littlejohn mounts in these federal proceedings. *See Littlejohn*, 85 P.3d at 296. Although we have held *supra* that his ineffective-assistance claim fails to evince the level of prejudice required under *Strickland*, we include the assumed error resulting from Mr. Rowan's alleged ineffective assistance in the cumulative-error analysis. *See Hooks*, 689 F.3d at 1195 (noting that any prejudice resulting from assumed deficient performance is properly considered in analyzing a petitioner's cumulative-error claim); *Spears v. Mullin*, 343 F.3d 1215, 1251 (10th Cir. 2003) (same); *cf. Littlejohn I*, 704 F.3d at 868 ("[A]fter an evidentiary hearing and other necessary proceedings upon remand, the district court may deem it appropriate to include the allegedly constitutionally deficient performance of Mr. Littlejohn's counsel in the cumulative-error calculus."). As a result, the cumulative-error claim advanced here differs from the claim that the OCCA confronted.

Accordingly, we evaluate the *current* cumulative-error claim "de novo under the *Brecht* standard, asking whether the various errors we have identified

40

collectively 'had substantial and injurious effect or influence in determining the jury's'" sentence. *Cargle v. Mullin*, 317 F.3d 1196, 1224 (10th Cir. 2003) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)); *see also Lockett v. Trammell*, 711 F.3d 1218, 1245 (10th Cir. 2013) ("AEDPA deference does not apply because the OCCA failed to consider all of the constitutional errors present in the case.").

An error may be deemed to have a substantial and injurious effect under *Brecht*'s rubric when a "conscientious judge [is left] in grave doubt about the likely effect of an error on the jury's verdict." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995); *see Welch v. Workman*, 639 F.3d 980, 992 (10th Cir. 2011) ("[A] 'substantial and injurious effect' exists when the court finds itself in 'grave doubt' about the effect of the error on the jury's verdict." (quoting *O'Neal*, 513 U.S. at 435)). Under these principles, we conclude that Mr. Littlejohn's cumulative-error claim is unavailing.

In *Littlejohn I*, we had occasion to separately consider whether the two additional errors that Mr. Littlejohn identifies here were prejudicial under the *Brecht* standard—the same one governing our cumulative-error analysis. *See Littlejohn I*, 704 F.3d at 833, 844. As to the first contention regarding the failure to allow adequate notice of the Meers testimony, we determined that, "[assuming] without deciding that Mr. Littlejohn has properly established a constitutional violation arising from the State's failure to provide adequate notice of Mr.

Meers's testimony," the error "was not [prejudicial]." *Id.* at 833. Specifically,

we concluded that "Mr. Littlejohn was allowed three days to prepare a response to

Mr. Meers's statement; [and] that, in fact, he did prepare a reasonably cogent

affirmative rebuttal case." *Id.* at 836. In addition, we emphasized that "Mr.

Littlejohn has not pointed to any additional favorable evidence that he would have

acquired if he had been given more notice; and that Mr. Littlejohn tested the

credibility of Mr. Meers and Ms. Bush [who bolstered Mr. Meers's testimony] on

cross examination." *Id.* In sum, in rejecting Mr. Littlejohn's claim of prejudicial

error, we determined under the *Brecht* standard that "we do not have any grave

doubts concerning the harmlessness of the (assumed) error involving a lack of

notice." *Id.* Mr. Littlejohn gives us no reason to depart here from our conclusion

in *Littlejohn I* that he did not suffer even modest prejudice (i.e, no prejudice at

all) from this first error—at least when viewed in isolation.[7]

Indeed, in his appellate briefing, Mr. Littlejohn provides no explanation for

why the limited notice caused him prejudice. Rather, he argues about the

damaging aspects of the Meers testimony itself and, more specifically, suggests

---

[7] Indeed, we may be constrained by the law-of-the-case doctrine from such a departure when *separately* analyzing the harmlessness of this first error—as well as the second. *See Kennedy v. Lubar*, 273 F.3d 1293, 1298–99 (10th Cir. 2001); *McIlravy v. Kerr-McGee Coal Corp.*, 204 F.3d 1031, 1034–35 (10th Cir. 2000). However, we need not resolve that question because even if we freely could depart from *Littlejohn I*'s separate prejudice assessments regarding these two errors, we would discern no reason to do so based on Mr. Littlejohn's arguments.

42

that the testimony must have had a prejudicial impact, otherwise the prosecution would not have been "at great pains to get this evidence before the sentencing jury." Aplt.'s Opening Br. at 65. However, this line of argument is inapposite. As we stated in *Littlejohn I*, "[a]t bottom, it must be emphasized that the alleged error here relates to a lack of *notice*—not the prejudicial content of Mr. Meers's testimony." 704 F.3d at 836. Accordingly, we conclude that the first error does not add one iota to the prejudice scale in the cumulative-error context. *Cf. Grant*, 727 F.3d at 1026 (noting that, for purposes of cumulative-error analysis, "all a defendant needs to show is a strong likelihood that the several errors in his case, when considered additively, prejudiced him").

Turning to the Confrontation Clause violations, these specifically concerned the admission in Mr. Littlejohn's resentencing of transcripts of testimony from two witnesses at the 1994 trial that related to Mr. Littlejohn's alleged admission of shooting the victim. In *Littlejohn I*, we deemed "the admission of [that] testimony" harmless for at least three reasons. 704 F.3d at 845. First, we concluded that the "contested testimony . . . hardly [constituted] central evidence in the prosecution's case," because the prosecution introduced the testimony during resentencing, as part of its presentation of "aggravating evidence supporting the jury's imposition of the death penalty—quite apart from evidence related to whether Mr. Littlejohn fired the fatal shot." *Id.* Second, we emphasized that "the State offered *other* competent evidence that Mr. Littlejohn

43

[acted as] the triggerman." *Id.* And, third, we noted that "Mr. Littlejohn's attorney thoroughly cross-examined the witnesses at the 1994 trial," including the two at issue, and that "[t]he entire transcripts of the testimony of [the two witnesses] were read into evidence, providing context for the jury to consider the deficiencies in the testimony." *Id.* at 846.

We then explained that

> the Supreme Court has recognized that counsel's prior ability to cross-examine an unavailable declarant in a prior proceeding that was not "significantly limited in any way" counsels in favor of a finding of no underlying violation. [*California v. ]Green*, 399 U.S. [149,] 166 [(1970)]. Here, we find the same considerations found in *Green* weigh in favor of a finding of harmless error because Mr. Littlejohn's counsel was not at all precluded from thoroughly cross-examining [the two witnesses] at the 1994 trial.

*Id.* at 847. Unlike the first error, the *Littlejohn I* court did not explicitly conclude that no prejudice flowed from this error. However, having studied our thorough prejudice analysis in *Littlejohn I*, we are hard-pressed to conclude that Mr. Littlejohn suffered anything more than modest prejudice from the error—if any prejudice at all.

Thus, standing alone, we are not convinced that more than one of the two additional errors (aside from the assumed error associated with the ineffective-assistance claim) that Mr. Littlejohn has identified was the source of prejudice to him. However, for purposes of further cumulative-error analysis, we are willing to assume *arguendo* that Mr. Littlejohn suffered modest prejudice from *both*

44

errors.  Consequently, the central question we must decide is whether this modest prejudice, when cumulated with any prejudice stemming from the alleged ineffective-assistance claim, would cause Mr. Littlejohn's resentencing proceeding to be fundamentally unfair and cause us to have grave doubts about whether the errors affected the jurors' verdict.  We answer this question in the negative.

In light of the now-clear shortcomings of Dr. Saint Martin's theory and evidence, we do not believe the *Strickland* prejudice question is a close one—*viz.*, Mr. Littlejohn did not come close to establishing the requisite quantum of prejudice to satisfy the *Strickland* standard.  We are prepared, however, to assume *arguendo* that Mr. Littlejohn suffered *some modest* prejudice due to Mr. Rowan's assumed constitutionally ineffective assistance at the resentencing.  In this regard, we acknowledge the view stressed in *Littlejohn I* that "[e]vidence of organic mental deficits ranks among the most powerful types of mitigation evidence available."  704 F.3d at 864.  And, as we also suggested there, such evidence—as a categorical matter—is likely at the apex of its potency when a psychiatrist (or other qualified physician), like Dr. Saint Martin, provides it; such a person can actually offer a medical opinion regarding whether a petitioner has suffered brain damage.  *See id.* at 865–66 ("[I]t is critical to note that Dr. Draper did not offer any opinion regarding whether Mr. Littlejohn in fact suffered pre-natal brain injuries and, indeed, she would not have been equipped to do so.  Dr. Draper was

45

not a psychiatrist—like Dr. Saint Martin—or any other type of physician, for that matter.").

Therefore, it seems reasonable to assume that the failure to investigate and present evidence of organic brain damage through the testimony of a physician may have engendered *some modest* prejudice. But, as we emphasized at the start, the prejudice analysis must always focus on the *precise nature* of the alleged organic brain damage. And, when we do that here, for the reasons explicated *supra*, we are unwilling to accord Mr. Littlejohn more than an assumption of *modest* prejudice: in brief, Dr. Saint Martin's qualitatively weak organic-brain-damage evidence warrants nothing more under the circumstances of this case, particularly given the likelihood of robust rebuttal evidence from the State.

From a purely additive or sum-of-the parts perspective, the three dashes of modest prejudice that we have assumed here—i.e., related to the Meers testimony, the testimony of the two 1994 witnesses, and Mr. Rowan's mitigation presentation—hardly constitute, in the aggregate, a recipe for the kind of prejudice that would render Mr. Littlejohn's resentencing proceeding fundamentally unfair or cause us to have grave doubts about whether the errors affected the jurors' verdict, especially when viewed in the context of the State's substantial case in aggravation. *See Grant*, 727 F.3d at 1026 ("[N]one of the three errors was anything more than modest on its own terms. Adding them together undoubtedly leads to a somewhat less modest sum. But even still they do

46

not collectively call into question the compelling case the government put on . . . ."); *see also Littlejohn I*, 704 F.3d at n.13 (noting that "the prosecution presented a substantial amount of aggravating evidence").

Moreover, Mr. Littlejohn has not meaningfully demonstrated how any of these three assumed errors possessed "an inherent synergistic effect" that would have made them collectively more potent than the sum of their parts. *Cargle*, 317 F.3d at 1221. Mr. Littlejohn offers us little more than his bald, conclusory statement that the "synergy of the errors . . . is obvious." Aplt.'s Opening Br. at 69. We disagree. *See Hanson*, 797 F.3d at 853 ("In *Cargle*, counsel had failed to challenge two vulnerable witnesses, the prosecution had improperly bolstered and vouched for those two witnesses, and the government had a weak case totally dependent on their credibility. In effect, all of the errors revolved around the issue of the credibility of those two witnesses. Hanson's case presents no such 'synergistic' effect." (citations omitted) (quoting *Cargle*, 371 F.3d at 1221)); *Black v. Workman*, 682 F.3d 880, 914 (10th Cir. 2012) (distinguishing *Cargle*, and saying that it was "not persuaded that the constitutional violations alleged in Defendant's application had an 'inherent synergistic effect.'" (quoting *Cargle*, 371 F.3d at 1221)).

To be sure, Mr. Littlejohn does attempt to show a "particularized synergy" by suggesting that, if the jury had received Dr. Saint Martin's organic-brain-damage evidence, it would have "ameliorated" the alleged prejudicial effects of

47

his "post-trial outburst" directed at Mr. Meers. Aplt.'s Opening Br. at 69. But this argument is predicated on Mr. Littlejohn's failure, once again, to acknowledge that the Meers-related error that we are considering in the cumulative-error analysis is *not* the admission of the evidence regarding the outburst itself—or, more precisely, the contents of the outburst—but rather the alleged inadequacy of the *notice* that Mr. Littlejohn's counsel received as to the prosecution's intent to admit the Meers evidence. And Mr. Littlejohn does nothing to suggest any "particularized synergy" between that notice error and any of the other two errors at issue.

Accordingly, considering the totality of the circumstances in Mr. Littlejohn's resentencing proceeding, we cannot conclude that the cumulative effect of the three harmless errors before us prejudiced Mr. Littlejohn within the meaning of *Brecht*.[8]

---

[8] Mr. Littlejohn suggests that the "realities" of the case favor a determination of cumulative error: specifically, he says the case involved "a single reactive gunshot" and "jurors were considering life without parole." Aplt.'s Reply Br. at 32. Mr. Littlejohn does not do much to develop this argument in the cumulative-error context and, for that reason, we could deem it waived. *See, e.g.*, *Grant*, 727 F.3d at 1025 ("Even a capital defendant can waive an argument by inadequately briefing an issue and we break no new ground by holding the same here." (citation omitted)); *see also Reedy v. Werholtz*, 660 F.3d 1270, 1275 (10th Cir. 2011) ("The argument section of Plaintiffs' opening brief does not challenge the court's reasoning on this point. We therefore do not address the matter."). However, even if we were to consider this argument on the merits, we would reject it for substantially the same reasons we rejected *supra* Mr. Littlejohn's similar argument that was aimed at establishing prejudice stemming from Mr. Rowan's assumed ineffective assistance.

## IV

For the reasons stated above, we **AFFIRM** the judgment of the district court.

14-6177, *Littlejohn v. Royal*
**TYMKOVICH**, CJ, concurring.

I concur in the judgment denying Littlejohn's habeas petition. I agree

Littlejohn suffered no prejudice from his counsel's failure to develop and present

evidence on organic brain damage. And I agree the cumulative effect of the

alleged errors did not prejudice Littlejohn. But I write separately to once again

express my view from the first habeas appeal that scientific testimony about

organic brain damage is not categorically more powerful than other types of

mental-health evidence.

## I.

The lynchpin of *Littlejohn I* was that "a more technical presentation of

organic brain injury evidence is inherently more persuasive than a more holistic

presentation of the kind offered by Dr. Draper." *Littlejohn v. Trammell*

*(Littlejohn I)*, 704 F.3d 817, 877 (10th Cir. 2013) (Tymkovich, J., concurring in

part and dissenting in part). The majority thus held Littlejohn's counsel may have

been constitutionally deficient because he failed to investigate whether organic

brain damage caused Littlejohn's behavioral issues—even though Dr. Draper, a

psychologist with a doctorate in child development, testified that Littlejohn

suffered from an emotional disturbance that reduced his ability to control himself

and empathize with others. *Id.* at 867.

I dissented, arguing the "central flaw in the majority's analysis is its

erection of a categorical invocation of 'organic brain injury' evidence as different

in kind for purposes of a *Strickland* analysis." *Id.* at 878. After all, "some jurors may be swayed by testimony that sounds more technical and scientific; others may be confused or skeptical. It can be a mixed bag." *Id.* I therefore believed the majority erred by "giv[ing] a talismanic quality to one type of mental health evidence without any showing that it [was] inherently more persuasive to juries than other evidence . . . ." *Id.* And because "there are countless ways to provide effective assistance[,]" I concluded counsel's decision to have Dr. Draper testify rather than a psychiatrist like Dr. Saint Martin fell well within the "wide latitude counsel must have in making tactical decisions." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). This was especially so because evidence of organic brain damage is a double-edged sword: it might have reduced the jury's sense of Littlejohn's moral culpability, but it might also have increased the jury's concerns about Littlejohn's future dangerousness. *See Littlejohn I*, 704 F.3d at 870 (Tymkovich, J., concurring in part and dissenting in part).

## II.

The district court's findings on Dr. Saint Martin's declaration support this view: Dr. Saint Martin's scientific-based testimony was no more powerful or persuasive than Dr. Draper's psychology-based testimony.

This is not surprising given what Dr. Saint Martin said all along. As he stated in his initial declaration, Littlejohn suffered from "a behavioral disorder manifested by poor impulse control, psychological immaturity and judgment that

-2-

is caused by neuro-developmental deficits experiences in his peri-natal development." R., Vol. 1 at 171. At the evidentiary hearing, Dr. Saint Martin confirmed the declaration by explaining how dysfunction in Littlejohn's frontal lobes caused his behavioral disorders—specifically, ADD and an impulse-control disorder. All Dr. Saint Martin added at the evidentiary hearing, then, was a formal ADD diagnosis. The fact the majority finds Dr. Saint Martin's testimony less persuasive than his largely identical declaration thus demonstrates that *Littlejohn I* did not need to assume that evidence of organic brain damage is intrinsically more powerful than other types of mental-health evidence.

To its credit, the majority adds two caveats to its broad *Littlejohn I* claim that evidence of organic mental deficits ranks among the "most powerful types" of mitigation evidence. *Littlejohn I*, 704 F.3d at 864. First, not all evidence of organic brain damage has the same potency. Maj. Op. at 21. Second, evidence of organic brain damage can sometimes have an aggravating, not mitigating, effect on the sentencing jury. *Id.* at 22–23. Yet the majority still asserts that evidence of organic brain damage is "as a categorical matter . . . likely at the apex of its potency when a psychiatrist (or other qualified physician), like Dr. Saint Martin, provides it . . . ." Maj. Op. at 48.

These proceedings demonstrate that evidence of organic brain damage is not categorically more persuasive than other types of mental-health evidence. And mental-health evidence is not necessarily at "the apex of its potency" when

presented by a physician rather than a psychologist. Maj. Op. at 48. Jurors are complex, unpredictable, and, above all, different. Some jurors may agree evidence a defendant suffers from organic brain damage is most persuasive when a physician presents it; others may be skeptical of science and persuaded by holistic and less scientific testimony. *See Littlejohn I*, 704 F.3d at 878 (Tymkovich, J., concurring in part and dissenting in part). Just as "the decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney," *Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008), so too is the strategic decision about which type of mitigation evidence will best resonate with a jury.

Nothing has changed my view that at the penalty phase of a capital trial, a lawyer's choice to present holistic, psychology-based testimony instead of scientific testimony on organic brain damage is a reasonable strategic choice. In fact, the last chapter of this case proves the point.